## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 7** |
| **LIQUID HOLDINGS GROUP, INC.,** *et al.*,[1] | **Case No. 16-10202 (KG)** |
| **Debtors.** | |
| **ALFRED T. GIULIANO**, in his capacity as Chapter 7 Trustee for the jointly administered Chapter 7 bankruptcy estates of Liquid Holdings Group, Inc., and Liquid Prime Holdings, LLC, | |
| **Plaintiff,** <br> **v.** | **Adv. Pro. No. _____** |
| **BRIAN FERDINAND, BRIAN M. STORMS, RICHARD SCHAEFFER, KENNETH D. SHIFRIN, JAY H. BERNSTEIN, DARREN C. DAVY, DAVID R. FRANCESCANI, WALTER F. RACQUET, THOMAS R. ROSS, VICTOR R. SIMONE, JR., DENNIS A. SUSKIND, ALLAN B. ZAVARRO, SANDLER O'NEILL & PARTNERS, L.P., FERDINAND HOLDINGS LLC, LT WORLD LIMITED, LLC, ROBERT KELLER, CMK HOLDINGS, LLC, SCHAEFFER HOLDINGS, LLC, and SHAF HOLDINGS, LLC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

## I.      INTRODUCTION

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Liquid Holdings Group, Inc. (2142) and Liquid Prime Holdings, LLC (2135).

1.      Plaintiff Alfred T. Giuliano, in his capacity as the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Liquid Holdings Group, Inc. and Liquid Prime Holdings, LLC (collectively, "Liquid" or the 'Debtors"), by and through his counsel, brings this action, *inter alia*: (a) to recover the mortal damages inflicted upon Liquid, a financial services software and technology company based in New York City, which collapsed into bankruptcy on January 27, 2016; (b) to avoid as fraudulent transfers various transactions, transfers and agreements executed and implemented in connection with deals Liquid made with company insiders at unjustifiably inflated prices in the run-up to its IPO; and (c) to recover in excess of $50 million from the Defendants who include transferees of the fraudulent transfers, officers, directors and controlling shareholders who orchestrated, implemented and profited from the wrongdoing alleged herein, and aiders and abetters of the wrongdoing of others.

2.      In the years preceding its bankruptcy, the Liquid officers named as defendants herein (the "Officer Defendants"), the Liquid directors named as defendants herein (the "Director Defendants"), with the active participation and substantial assistance of Sandler O'Neill & Partners, L.P. ("Sandler"), caused Liquid to acquire money-losing companies from insiders and affiliates at inflated prices, record millions in fictitious revenues and customers in order to enable the company to go public at an unjustifiable valuation, and then continued the fiction as part of a scheme to conceal staggering losses and perpetuate the illusion that Liquid was a financially viable and emerging technology company while the Defendants looted the company at the expense of Liquid and its creditors.

## II.    <u>JURISDICTION AND VENUE</u>

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

4.      The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does <u>not</u> consent to the entry of final judgment or adjudication by a bankruptcy judge.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(c).

## III.    <u>PARTIES</u>

### <u>The Plaintiff</u>

6.      Plaintiff Alfred T. Giuliano is the duly appointed Chapter 7 Trustee of the bankruptcy estates of Debtors Liquid Holding Group, Inc. ("LHG") and Liquid Prime Holdings, LLC ("LPH" and, together with LHG, collectively, "Liquid" or the "Debtors"). Plaintiff maintains an office at c/o Giuliano Miller & Company, 140 Bradford Drive, West Berlin, New Jersey 08091.

7.      On January 27, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware – with the cases being jointly administered under the caption, *In re Liquid Holdings Group, Inc.*, *et al.* U.S.B.C. D. Del., Case No. 16-10202 (KG). On February 26, 2016, the Liquid bankruptcy cases were converted to cases under Chapter 7 of the Bankruptcy Code, and Plaintiff was appointed as Trustee of the Liquid bankruptcy estates.

**The Defendants**

*The Officer Defendants*

8.　　Defendant Brian Ferdinand ("Ferdinand") is an individual residing at 224 Muttontown Eastwood Road, Syosset, New York.  Defendant Ferdinand was President of LHG from April 2012 until March 2013.  In March 2013, Ferdinand became Head of Corporate Strategy of LHG.  He was also a director of LHG from inception, until April 18, 2014, when he resigned from the Board and from his position as Head of Corporate Strategy.

9.　　Defendant Brian Storms ("Storms") is an individual residing at 67 Roxiticus Road, Far Hills, New Jersey.  On December 1, 2012, Storms became Chief Executive Officer ("CEO") and a director of LHG, and he remained CEO until March 1, 2015.  After being relieved of his duties as CEO, Storms remained on the Board until resigning on September 8, 2015.

10.　　Defendant Kenneth Shifrin ("Shifrin") is an individual residing at 955 South Springfield Avenue, Unit 807, Springfield, New Jersey.  Shifrin served as LHG's Chief Financial Officer ("CFO") until resigning on October 24, 2014.  Defendants Storms, Ferdinand and Shifrin are referred to collectively in this Complaint as the "Officer Defendants."

*The Director Defendants*

11.　　Defendant Richard Schaeffer ("Schaeffer") is an individual residing at 290 Hudson Street, New York, New York.  Schaeffer was a director and Chairman of the Board of LHG from inception until July 26, 2013, when he resigned the Chairmanship.  He remained on the Board until his resignation on December 23, 2013.

12.     Defendant Jay H. Bernstein ("Bernstein") is an individual and Chairman and CEO of NIC Holding Corporation, which maintains a place of business at 225 Broad Hollow Road, Melville, New York 11747.  Bernstein was a director of LHG from the IPO Date until he resigned on October 28, 2014.

13.     Defendant Darren C. Davy ("Davy") is an individual and CEO and Principal of Davy Capital Management, with a corporate headquarters at 509 Madison Ave, Fl. 10, New York, NY 10022.  Davy was a director of LHG from the IPO Date until he resigned on September 22, 2014.

14.     Defendant David R. Francescani ("Francescani") is an individual with a place of business at Fish & Richardson, P.C., 601 Lexington Ave, 52nd Floor, New York, New York 10022.  Francescani was at all relevant times a director of LHG.

15.     Defendant Walter F. Raquet ("Raquet") is an individual and CEO and Director at Green Earth Technologies, Inc., with an address of PO Box 4644, Greenwich, CT 06831.  Raquet was at all relevant times a director of LHG.

16.     Defendant Thomas R. Ross ("Ross") is an individual and owner at Carradale Partners LLC with a place of business at 1239 W. Altgeld St., Chicago, IL 60614.  Ross was a director of LHG from the IPO Date until he resigned on September 22, 2014.

17.     Defendant Victor R. Simone, Jr. ("Simone") is an individual and Senior Industry Executive at Welsh, Carson, Anderson & Stowe with a place of business at 224 Airport Parkway, San Jose, CA 95110. Simone was at all relevant times a director of LHG.  From December 23, 2014 onward, Simone served as Non-Executive Chairman of the Board of LHG, succeeding Storms.

18.    Defendant Dennis A. Suskind ("Suskind") is an individual with a place of business at Bridge Bancorp, Inc., 2200 Montauk Highway, Bridgehampton, New York 11932. Suskind was at all relevant times a director of LHG.

19.    Defendant Allan B. Zavarro ("Zavarro") is an individual with a place of business at H&H Capital Partners, 40 Wall Street, New York, New York 10005. Zavarro was a director of LHG from the IPO Date until he resigned from the Board on February 20, 2015. Defendants Schaeffer, Bernstein, Davy, Francescani, Raquet, Ross, Simone, Suskind and Zavarro are referred to collectively in this Complaint as the "Director Defendants."

*Sandler O'Neill & Partners*

20.    Defendant Sandler O'Neill & Partners, L.P. ("Sandler") is a Delaware limited partnership, with a place of business at 1251 Avenue of Americas, 6th Floor, New York, New York 10020. Sandler served as the sole underwriter of LHG's IPO.

*The Transferee Defendants*

21.    Defendant Robert Keller ("Keller") is an individual and Chief Operating Officer at ECHOtrade LLC with a place of business at 440 South Lasalle Street, Chicago, IL 60605.

22.    Defendant CMK Keller Holdings, LLC ("CMK") is a Delaware limited liability company, with an address at c/o Stellar Corporate Services LLC, 3500 South Dupont Highway, Dover, DE 19901. CMK is wholly owned and controlled by Defendant Keller.

23.    Defendant Ferdinand Holdings LLC is a Delaware limited liability company with its principal place of business in the State of New York. Upon information and belief, Defendant Ferdinand is the sole member of Ferdinand Holdings LLC.

24.     Defendant LT World Limited, LLC a Delaware limited liability company with its principal place of business in the State of New York.  Upon information and belief, Defendant Ferdinand is the sole member of LT World Limited, LLC.

25.     Defendant Schaeffer Holdings LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in New York, New York.  Upon information and belief, Defendant Schaeffer owns and controls Schaeffer Holdings LLC.

26.     Defendant SHAF Holdings LLC is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York.  Upon information and belief, Defendant Schaeffer owns and controls SHAF Holdings LLC.

## IV.    FACTS

### Liquid Embarks on an Overpriced Acquisition Spree with an Eye Towards an IPO

27.     LHG was formed as a Delaware limited liability company on January 17, 2012. Its founding members were Schaeffer Holdings, LLC, SHAF Holdings, LLC (both owned and controlled by Schaeffer), Ferdinand Holdings, LLC (owned and controlled by Ferdinand), and CMK Keller Holdings, LLC (owned and controlled by Keller).

28.     At the outset, Schaeffer Holdings, LLC owned 12.96% of Liquid; SHAF Holdings LLC owned 10.67%; Ferdinand Holdings owned 39.43% and CMK Keller Holdings owned 36.94%.

29.     Ferdinand, Keller and Schaeffer, together with their affiliated entities, are referred to herein collectively as the "Founders."

30.    As its name implies, Liquid was designed to act as a holding company that would acquire a group of related companies, which would pursue an initial public offering (the "IPO").

31.    Though rooted in earlier activities involving its founders, Liquid's acquisition spree began in earnest in early 2012.

*Liquid Futures, LLC*

32.    Liquid Futures, LLC was allegedly a National Futures Association registered non-clearing futures commission merchant that provided commodity hedging solutions.  Liquid Futures LLC had been formed on August 25, 2011, with Schaeffer owning 90% of the membership interests and Ferdinan owning the remaining 10%.  For these interests, each had contributed only $100.

33.    Pursuant to certain Contribution Agreements dated April 12, 2012 (which became effective May 9, 2012), Liquid acquired Liquid Futures, LLC, which had been wholly owned by Liquid founders Ferdinand and Schaeffer.

*Liquid Prime Holdings LLC / Liquid Prime Services, Inc.*

34.    Initially formed by Ferdinand as Liquid Prime Services, LLC on September 22, 2011, the name was changed to Liquid Prime Holdings LLC on October 25, 2011.

35.    Ferdinand was the sole member, and contributed $100 for this initial membership interest.

36.    Pursuant to another Contribution Agreement, also dated April 12, 2012, between LHG and Ferdinand, LHG acquired Liquid Prime Holdings, LLC.

37.    Pursuant to a stock purchase agreement, dated October 27, 2011, Liquid Prime Holdings acquired 100% of the stock of Taconic Capital Group Inc., a FINRA-registered broker

dealer, in exchange for $115,000 in cash, with the closing conditioned on approval of the transaction by FINRA, which was received on January 6, 2012.

38.    Taconic Capital Group Inc., a New York corporation, was formed on May 16, 2003, and changed its name to Liquid Prime Services Inc. on November 17, 2011.

39.    Liquid Prime Services, Inc. is thus a FINRA-registered broker-dealer.  It allegedly provided execution, financing and market access solutions for asset managers in the equities, fixed income and derivatives sectors.

40.    The parties agreed pursuant to the contribution agreement that the contribution constituted a capital contribution to LHG on behalf of Ferdinand Holdings, LLC.

41.    The Limited Liability Company Agreement of LHG, dated April 24, 2012, but made effective as of January 17, 2012, contemplated that Ferdinand Holdings, LLC would receive its initial membership interests in LHG in consideration for these contributed assets.

*Liquid Trading Institutional LLP*

42.    Liquid Trading Investment Advisers LLP, a company incorporated in England and Wales, was formed on April 1, 2011.  The founding members were LT Global Limited (controlled by Brian Ferdinand), Liquid Trading Holdings LLC (controlled by Robert Keller), Asset Alliance International (UK) Limited (controlled by Bruce Lipnick) and Liquid Trading Holdings II LLC (controlled by Solomon Yakoby).

43.    On March 12, 2012, Liquid Trading Investment Advisers LLP changed its name to Liquid Trading Institutional LLP, a FSA registered broker-dealer providing "mini-prime" trading arrangement and market access solutions for European-based managers.

44.    Pursuant to yet another Contribution Agreement dated April 12, 2012, this one between Liquid, CMK Keller Holdings, and Liquid Trading Holdings, LLC, Liquid received 48.75% of the equity interests in a company called Liquid Trading Institutional LLP, effective upon FSA approval – received July 2, 2012.

45.    Liquid acquired the balance of the equity in Liquid Trading Institutional LLP pursuant to (a) a Contribution Agreement dated April 24, 2012, between Liquid, Ferdinand Holdings, LLC, and LT World Limited, whereby LT World Limited contributed 48.75% of the equity interests in Liquid Trading Institutional LLP to Liquid; and (b) a Contribution Agreement dated June 5, 2012, between Liquid, Solomon Yakoby and Liquid Trading Holdings II, LLC, whereby Liquid Trading Holdings II, LLC contributed 2.5% of the equity interests in Liquid Trading Institutional LLP to Liquid.

46.    Pursuant to the Contribution Agreements referenced in the two preceding paragraphs, the parties agreed that the contribution of these interests in Liquid Trading Institutional LLP constituted capital contributions to Liquid on behalf of CMK Keller Holdings, LLC, Ferdinand Holdings, LLC and Solomon Yakoby.

47.    Liquid's LLC Agreement, dated April 24, 2012 but made effective as of January 17, 2012, contemplated that CMK Keller Holdings, LLC and Ferdinand Holdings, LLC would receive their initial membership interests in Liquid in consideration for the contributions of Liquid Futures LLC, Liquid Prime Holdings LLC and Liquid Trading Institutional LLP.  All told, the Founders' entities received $123,446,000 in Liquid stock as a result of these transactions.

10

48.     These transactions by which Liquid acquired Liquid Futures LLC, Liquid Prime

Holdings LLC and Liquid Trading Institutional LLP are hereinafter referred to, collectively, as

the "Founding Transfers."

*Fundsolve, Ltd.*

49.     On April 23, 2012, Liquid entered into a Share Purchase Agreement, by which it

would acquire Fundsolve Ltd., a U.K. company partially owned by Defendant Davy.

50.     Fundsolve was a portfolio risk reporting company originally formed on February

9, 2006 and incorporated in England and Wales.

51.     The Fundsolve acquisition was conditioned upon the integration of Fundsolve's

software with certain other software, which was allegedly completed on July 31, 2012.

52.     Liquid ultimately issued $1,690,000 in common stock in exchange for Fundsolve.

53.     The transaction by which Liquid acquired Fundsolve is hereinafter referred to as

the "Fundsolve Transfer."

54.     The ostensible purpose of this acquisition was to acquire Fundsolve's risk

management technology.  The Fundsolve acquisition added little if anything to Liquid's revenue.

As of 2012, Fundsolve had revenues of only GBP 60,359, along with cash of only GBP 1,368.

*Tragara Alpha Partners, LLC*

55.     Next, on April 27, 2012, Liquid entered into a Contribution Agreement with

Tragara Alpha Partners LLC, whereby Liquid received certain algorithmic trading software

known as the "Blackbird Software" in exchange for 5% of the company's outstanding stock,

valued at $6,183,000.

11

56.     The transaction by which Liquid acquired the Blackbird Software from Tragara Alpha Partners LLC is hereinafter referred to as the "Tragara Transfer."

57.     In connection with the Contribution Agreement, Samuel Gaer (who owned and controlled Tragara Alpha Partners LLC) entered into an Employment Agreement with Liquid, pursuant to which he agreed to serve as Liquid's Chief Executive Officer.

*Liquid Partners, LLC*

58.     Next, on May 11, 2012, Liquid acquired a company called Liquid Partners, LLC, which had previously been known as Centurion Capital Group LLC (and, before that, Centurion South, LLC).  This company was originally formed two years earlier, in 2010, by Joseph Gamberale and D&L Partners, L.P. (an entity controlled by Douglas Von Allmen, who would later figure prominently in Liquid's activities).

59.     In 2011, Liquid Partners had revenues of only $60,000 against a net loss of $4,551,231, and financed its operations principally through related party transactions.  Liquid Partners believed its ability to continue operating depended upon raising capital through an acquisition.

60.     In December 2011, Ferdinand – soon to become Liquid's President – acquired Liquid Partners from Gamberale and D&L through a company he controlled called Liquid Trading Holdings Ltd.

61.     Five months later, now on both sides of the transaction, Ferdinand caused Liquid to enter into a membership interest purchase agreement with Liquid Trading Holdings Limited, whereby Liquid acquired the equity of Liquid Partners in exchange for $10,300,000 in Liquid stock.

62.     The Liquid shares were distributed to Liquid Partners' prior owners as follows: 37.5% to Gamberale, 37.5% to the Douglas J. Von Allmen Trust dated April 25, 1989, 15% to Edward Fiegeles, and 10% to John Allen.

63.     Liquid Partners supposedly was acquired to provide Liquid with an established customer base and select group of experienced traders and fund managers to assist in the testing and development of Liquid's technology.

64.     Liquid paid this exorbitant price for Liquid Partners despite the latter's obvious inability to continue as a going concern.  Liquid booked $8,580,157 of the acquisition price as "goodwill."

65.     The transactions by which Liquid acquired Liquid Partners, LLC are hereinafter referred to, collectively, as the "Liquid Partners Transfers."

*Liquid View LLC*

66.     On July 30, 2012, pursuant to an Assignment Agreement between Liquid, on the one hand, and Ferdinand, Ferdinand Trading, LLC, Ferris Ventures, LLC and Robert Keller (collectively, the "Assignors"), on the other hand, Liquid acquired the all of the Assignors' right, title and interest in and to certain software known as Liquid View.

67.     In exchange for assigning the Liquid View software to Liquid, Ferdinand received $1,000,000 in cash, and Keller received $500,000 in cash.

68.     The transaction by which Liquid acquired Liquid View is hereinafter referred to as the "Liquid View Transfer."

13

*Green Mountain Analytics LLC*

69.     On August 27, 2012, Liquid entered into a Contribution and Exchange Agreement with the owners of a company called Green Mountain Analytics, LLC, whereby Liquid acquired all of the membership interests in Green Mountain.

70.     Green Mountain was a financial software development company that was originally formed in 2002 under the name Clock Capital, LLC, changing its name to Green Mountain Analytics, LLC in 2004, and in which Ferdinand and Keller acquired a majority interest in 2011.

71.     As of December 31, 2011, Green Mountain had an accumulated deficit of $3,611,603. It derived the majority of its revenue from related parties. As of August 27, 2012, when it was acquired by Liquid, Green Mountain had cash of only $84,717. These conditions raised substantial doubt about Green Mountain's ability to continue as a going concern, and its ability to do so depended upon its ability to raise capital through an acquisition.

72.     Nonetheless, to acquire Green Mountain, Liquid paid the sellers (including Ferdinand) 11.75% of Liquid's stock, valued at $19,973,000.

73.     The transaction by which Liquid acquired Green Mountain is hereinafter referred to as the "Green Mountain Transfer."

74.     After its acquisition by Liquid, Green Mountain's name was changed to Liquid Technology Services, LLC.

*LTI, LLC*

75.     LTI, LLC was originally formed on August 22, 2011, to raise capital to invest in Liquid Trading International, LLP (later renamed QuantX). At the time, the Founders

envisioned that QuantX, rather than Liquid, would pursue a public offering.  The decision was ultimately made to go public in the U.S. markets using Liquid as the vehicle.

76.    On January 10, 2012, LTI raised $3,835,000 in investment capital pursuant to a certain Use of Proceeds Agreement, which ultimately resulted in LTI receiving a 2.855% ownership position in Liquid.

77.    On September 30, 2012, LTI was contributed to Liquid.  The effective purchase price paid by Liquid was $5,079,000.

78.    Although LTI was a holding company with no tangible assets, Liquid paid $5,079,000 to acquire its $1,139,000 in total net assets and was left to book the balance of the purchase price of $3,940,000 as "goodwill."

79.    The transaction by which Liquid acquired LTI is hereinafter referred to as the "LTI Transfer."

80.    The Founding Transfers, the Fundsolve Transfer, the Liquid Partners Transfers, the Tragara Transfer, the Liquid View Transfer, the Green Mountain Transfer and the LTI Transfer are hereinafter referred to, collectively, as the "Transfers."

81.    The acquisition of LTI was the last in the series of acquisitions by which Liquid was assembled.  The following diagram depicts Liquid's corporate structure after the LTI acquisition:



82.    Having completed its acquisition spree, Liquid proceeded to focus on preparations

for an IPO.

83.    On December 1, 2012, Defendant Storms replaced Gaer as Liquid's CEO.

Storms's primary objective from day one was to consummate the IPO.

**Liquid Is At All Times Wholly Dependent Upon Closely Related-Party QuantX**

84.    QuantX (then known as Liquid Trading International LLP) was formed on

February 18, 2008 under the laws of England and Wales.

85.    QuantX acted as a fund-of-funds, which concentrated its investments in emerging

market funds.  It operated by allocating capital to certain investment managers, who would make

investment decisions and be paid a percentage of profits.

86.    QuantX was a Liquid customer.

87.    QuantX also marketed Liquid to its members and investment managers.

88.    Prior to Liquid's IPO, entities owned by Liquid Founders Ferdinand, Keller and Schaeffer owned 46% of QuantX through various holding companies.

89.    Members of the Liquid Board including Defendants Bernstein, Davy and Ross also owned stakes in QuantX.

90.    From the time Liquid commenced operating on April 24, 2012 through December 31, 2012, QuantX accounted for 75% of Liquid's software licensing revenues.

91.    During that same period (April 24 – December 31, 2012), all related parties including QuantX accounted for 86% of Liquid's software licensing revenues.

92.    Liquid's dependence on related parties, principally QuantX, never changed throughout its existence.  The extent of this dependence was well-known to Liquid's officers and directors.

93.    In June 2012, Liquid loaned QuantX $5,000,000, conditioned on QuantX's continued use of Liquid products.

94.    The first quarter of 2013 saw QuantX's share of Liquid's software licensing revenues increase, to 76%.

### Both Liquid and QuantX Run on Investment Funds from Douglas Von Allmen

95.    From the time of its founding until its IPO in July 2013, Liquid survived on money from two sources:  new funds from investors and cash from operations.  But these were largely one and the same, because the cash from operations came overwhelmingly from QuantX, which itself was running on investor cash.

96.    Moreover, much of the investor money pouring into both Liquid and QuantX came from a single source:  Florida-based investor Douglas Von Allmen.

97.    On June 28, 2012, Von Allmen, through an entity called HA Investments III, executed a subscription agreement in the amount of $12.5 million for Liquid stock.

98.    Unbeknownst to Von Allmen, however, the full amount of this investment did not go to Liquid, because the company was forced to pay a finder's fee of $1,250,000 on Von Allmen's investment to Gamberale.  In return for this investment, Von Allmen received 1,239,986 Liquid shares.

99.    In subsequent emails between Defendants Ferdinand and Shifrin, Shifrin asked whether Von Allmen knew that Gamberale had received the finder's fee (and thus that Von Allmen's actual investment was $11.25 million, not $12.5 million as he believed).  Ferdinand responded that it was "[p]robably not the best idea to point it out."

100.    In January 2013, Von Allmen's children, David Von Allmen and Julia Von Allmen, invested $500,000 each.  In return, they each received 0.29% of Liquid's outstanding stock.

101.    On April 5, 2013, Liquid issued an additional 728,498 shares to an entity controlled by Von Allmen.  These shares had a reported value of $5,273,450.  Von Allmen paid nothing for these shares, which were given to him due to his ongoing financial support of Liquid.

102.    Meanwhile, Von Allmen's money was also propping up QuantX, Liquid's primary source of revenue.

103.     On March 1, 2013, through D&L Partners, Von Allmen loaned $7.5 million to QuantX pursuant to a Demand Promissory Note, the full amount of which had already been advanced to QuantX in February.

104.     On May 15, 2013, Von Allmen – this time through the Von Allmen Dynasty Trust – made another loan to QuantX, infusing another $4 million into the company.

### Liquid's IPO Staggers to the Finish Line

105.     On April 11, 2013, Liquid filed its initial S-1 securities registration statement with the SEC.  In this document, Liquid made the following representations:

a.     Liquid has developed and provides proprietary next generation technology that seamlessly integrates trading, real-time risk management, accounting, reporting and administration tools in a single platform for the financial services community.

b.     Liquid has "current and prospective customers" which include "small to mid-size hedge fund managers, asset managers, wealth management offices, family offices and financial institutions."

c.     Liquid's technology is delivered "through the cloud."

d.     During the period from April 24, 2012 through December 31, 2012, Liquid had revenues from software licensing of $1,000,000, and had 24 licensee-customers paying fees for 350 "units" consisting of individual elements of the Liquid technology platform.

e.     Of the 350 fee-generating units, 290 were being used by QuantX.

106.     On June 1, 2013, Liquid discontinued its over-the-counter brokerage operations, leaving software as its only source of revenue.

107.    On July 9, 2013, Liquid filed an amended registration statement with the SEC indicating a Proposed Maximum Offering Price of $63.25 million for 5 million shares.

108.    On July 24, 2013, only two days before its scheduled IPO, Liquid filed another amended registration statement, which dropped the Proposed Maximum Offering Price to $53.13 million for 4.2 million shares.

109.    The day before shrinking the size of its offering, Liquid was sued in New York state court by two individuals, Thomas Ryan and John Lugano, who had been hired by Liquid to operate an inter-dealer broker and commodity business for one of Liquid's subsidiary companies.

110.    In their Complaint, Ryan and Lugano accused Liquid and Ferdinand of defrauding them through a host of misrepresentations.  They also claimed that Liquid required them to purchase software that was incapable of performing the functions represented by Liquid and Ferdinand, and in fact did not work at all.

111.    Liquid's IPO occurred on July 26, 2013.  In the IPO, Liquid sold 3,175,000 shares at $9.00 per share, which yielded $26,717,625 net of the underwriting discount.

112.    By far the largest buyers in the IPO were Ferdinand and Von Allmen, who collectively purchased $16.2 million worth of shares.  This left only $12.375 million that was actually sold to the public.

113.    Moreover, although this fact was not disclosed publicly, Von Allmen had a pre-IPO deal with the company by which he would later receive 732,292 shares for free, which would bring his total per share cost down from $9.00 to $6.31.

114.    The IPO officially closed on July 31, 2013.  As a result, Liquid received net proceeds of only $17.3 million, after paying $2.6 million in commissions and $8.7 million in

offering-related expenses.  In other words, approximately 40% of the offering's proceeds went to pay the costs of the offering itself.

115.    Moreover, $3.2 million of the net proceeds immediately went out the door to company insiders (including Ferdinand, Schaeffer, Storms, Ross and Keller) in the form of loan repayments, stock repurchases, IPO bonuses and one-time payments.

116.    Thus, as a result of the IPO – which was initially designed to raise more than $60 million – only $14.76 million was actually made available to the company.

117.    The IPO money did not last long, and Liquid soon found itself in need of additional financing, as did QuantX.

### The IPO, Which Was Based on Misrepresentations, Fails to Solve the Company's Problems, and Defendants Struggle to Keep Liquid and QuantX Afloat

118.    On August 6, 2013, Von Allmen – whose loans to QuantX had been sustaining its operations for months – wrote to Ferdinand that he "was thinking that maybe I did not let you know that I am interested in us owning QuantX."  Ferdinand wrote back: "We are on the same page.  I'm working up an executable plan for us and will review with you once it is ironed out."

119.    On August 8, 2013, an attorney working for Von Allmen sent an email to Ferdinand and his colleague Michael Tew with the subject line "Doug's 13D," which relayed the following message from Von Allmen:

> "There are some agreements for pre IPO holders to transfer some pre IPO shares to me after the six months, but I would not include this unless we have to and not without discussing with Brian.  I consider it a correction of pricing errors on my investment pre IPO and just reducing my average cost per share on those shares."

The attorney told Ferdinand and Tew that he believed the information about these agreements needed to be included in the 13D filing with the SEC and that the agreements needed to be attached as exhibits.  Ferdinand tersely replied "They cannot be included."  Soon after, this time

copying Storms as well, he replied again: "These are private agreements between partners and have nothing to do with the company."

120.    Although Von Allmen's counsel's advice was clearly correct, Ferdinand carried the day, and the pre-IPO agreements to reduce the per share price of Von Allmen's investment remained undisclosed.

121.    Liquid filed its 10-Q for the second quarter of 2013 on September 9, 2013.  In it, Liquid stated that as of June 30, its total customer base had fallen to 23 (from 25 on March 31), but total Units used by those customers had risen to 385 (from 351 on March 31).  According to the 10-Q, of those 385 Units, 304 – 79% -- were being used by QuantX.

122.    Approximately two weeks later, on January 26, 2013, Von Allmen (through D&L Partners) infused another $2 million into QuantX.

123.    After another two weeks went by, Von Allmen put yet another $4 million into QuantX.

124.    Liquid filed its 10-Q for the third quarter of 2013 on November 14, 2013.  This quarterly report stated that Liquid had experienced customer growth in terms of both total customers (up to 27 from 23) and Units (up to 455 from 385).  Per the 10-Q, dependence on QuantX continued to increase, with QuantX using 378 of the 455 revenue-generating Units – more than 83%.

125.    On December 5, 2013, frustrated by the tax consequences of the restricted stock units he received, Storms wrote to Ferdinand using personal emails "for obvious reasons" that he had "been sick to [his] stomach for weeks."  Storms explained that while he would "defend this company and it's [sic] valuation all day publicly we have to have real conversations between us.

The reality is as follows, we went public at a crazy valuation relative to any real multiple of revenue and are still maintaining a super high value that hopefully we can grow into." Storms further explained that "with all the business pressure" he was "living with, the idea of writing these mega checks against the reality of the history here is something I can't reconcile." This made him "enormously uncomfortable."

126.    Defendant Schaeffer, one of the company founders, resigned from the Board on December 23, 2013.

127.    On January 10, 2014, David Solimine, an early investor in both Liquid and QuantX who had entered into a settlement agreement with the Company in May 2013, voiced his views on the situation to one of his partners, which made their way back to QuantX's Tew. Tew relayed the highlights of his conversation with Solimine in an email to one of Liquid's attorneys, and copied Ferdinand:

Here are the key points from my conversation with him:

1. "That whole IPO of Liquid was a fraud, the whole company is a fraud, wait until we get the SEC in there, those guys are all going to jail"
2. "Richie [Schaeffer] is a fraud, and he owes me big time"
3. "That Brian Storms he's a bag of wind and he's a fraud too"
4. "Ferdinand, he's a fraud too, that whole IPO was orchestrated by him. Wait until the SEC comes in to investigate him, he's going to jail. I'm telling you. They're all going to jail."
5. "The secondary [offering] – that's going to be a failure and a fraud too. They'll never get it done. You're running the secondary right?" (Tew says no I don't work at Liquid anymore, not since the IPO). He says "That's not what we were told, we were told you're running the secondary."

128.    As Tew's email alluded to, Liquid was planning to conduct a secondary offering to raise more capital by selling additional shares to the public. This information was confidential and not disclosed to the public until April 9, 2014, when the Company filed the S-1 Registration Statement for the secondary offering.

23

129.    By this time, Von Allmen's dissatisfaction with the dilution his investment had sustained had ripened into a formal dispute with the Company and certain of its founders.  On February 3, 2014, Liquid's General Counsel sent an email to Von Allmen's lawyers attaching his markup of a draft Stock Transfer Agreement involving Von Allmen and Defendant Schaeffer.  In this draft, the recitals stated that "after the IPO Von Allmen expressed to the Company's founders (the "Founders") including Schaeffer … his dissatisfaction with the amount of dilution he had sustained since the Investment and his belief that there was a general understanding (the "Understanding") between the founders and him that the Founders would provide certain anti-dilution protection to him and his affiliates."  The draft Stock Transfer Agreement provided for Schaeffer to transfer 363,713 shares of Liquid common stock "in full and final resolution of the Understanding as it relates to Schaeffer."

130.    In a follow-up email sent soon afterward, Liquid's GC revised the comments he sent earlier in the day, noting that "As I sit back and read it, I think that says too much" – meaning that it was a bad idea to expressly acknowledge the existence of the Company's undisclosed pre-IPO agreement with Von Allmen to insulate him from dilution.  He proposed to remove reference to the concept of the "Understanding," and simply replace it with a statement that the parties desired to resolve any issues between them arising out of the dilution suffered by Von Allmen.

131.    This Stock Transfer Agreement between Von Allmen and Schaeffer was finalized later in February, as were others between Von Allmen, on the one hand, and Ferdinand and Keller, respectively, on the other hand.  In addition, Ferdinand also was forced to give away shares to Von Allmen's children, David and Julia, and Old Greenwich Capital, in order to

resolve pre-IPO dilution related complaints.  Some of these transactions were eventually

disclosed in S-1/A forms filed with the SEC on May 13, 2014, which noted that "In late February

of 2014, entities controlled by two of our founders, Brian Ferdinand and Robert Keller,

transferred 732,292 shares of our common stock to an entity controlled by Douglas J. Von

Allmen and certain other pre-IPO stockholders without the payment of any cash consideration."

(emphasis added).

132.    On February 4, 2014, Shifrin emailed Storms with a "heads up," telling him that

he was about to request payment from QuantX of the December 2013 receivable, in order to

have it "in time for audit examination by KPMG."  Shifrin explained that "[t]he payment should

have been in weeks ago," and "[t]he later the payment the harder to support December revenue

recognition."  Storms told Shifrin to "[b]e clear about the audit issue and need to resolve by

Friday."  Thus, as this email demonstrates, Liquid's top officials including its CEO and CFO

were aware no later than February 2014 that QuantX, by far the Company's largest revenue

source, was late in making payments to Liquid.

133.    With plans progressing towards the secondary offering (internally code-named

"Project Marlin"), on March 1, 2014, Ferdinand emailed Storms to tell him that he was "in the

market Monday for a couple hundred thousand shares of Liquid, and that Von Allmen was

"going to clean Sam [Gaer] out."  Storms wrote back that he had spent an hour the day before

arguing with Liquid's lawyers that Ferdinand, Von Allmen and Defendant Raquet should be

permitted to transact in Liquid stock.  Storms specifically noted that "[t]he issue is the

knowledge you have about a pending cap raise," but he convinced the lawyers that the company

was "at least ten days away from having anything definitive so you can purchase this week."

134.    A few weeks later, Storms texted a friend that he "[w]oke up thinking about you and your investment in Liquid." Recognizing that what he was about to do (disclose material non-public insider information he knew would be used to trade in Liquid securities) – Storms warned "Text is better than email." Then, he told Ferdinand: "Confidentially, we are filing for secondary offering next Fri. Mkt is pricing us down in anticipation which I am learning is pretty standard. Will keep you posted. Let me know if you would like to discuss."

135.    Meanwhile, the financial problems at QuantX continued to worsen. On March 21, 2014, Kevin Loprimo of Global Prime Partners sent Tew an email entitled "quantx margin" in which he reported that QuantX was on margin call "again today" and that they really needed to "get some cushion … so this doesn't keep happening." Tew responded that QuantX would meet the margin call.

136.    Three days later, Loprimo told Tew and Ferdinand that equity in QuantX was down to $4.3 million and was on call for $513,000. He also noted QuantX's cross-guarantee of a $4 million loan to Diamond LT UK LLP, another entity affiliated with Ferdinand. Loprimo then warned that they needed "more capital put into the account today or tomorrow at the latest, and should not have let wires out without more capital in."

137.    Then, on March 28, 2014, Storms wrote to Ferdinand about another $500,000 payment due by QuantX to Liquid. Ferdinand shot back that "This is the last pressure that can be put on QuantX. It's having a terrible quarter and will break if it's stretched any further." Storms rejoined that this was "not new pressure" but "the existing contracts." Storms reminded Ferdinand that this money owed by QuantX was "a major piece of our revenue and if it is really month to month combat then we have a major problem!!"

26

138.    After receiving Storms's email, Ferdinand wrote to Loprimo the next day: "I really need to make sure the payment goes Monday and also 250k out to QuantX.  If we don't its [sic] going to be a major issue."  An incredulous Loprimo wrote back:

> Hi Brian,
>
> I hope you take what I am about to say in the right way, as I do value our relationship.
>
> It sounds like you are asking me to pay out $250k to Liquid for QuantX on Monday and $250k to Quant X also on Monday.
>
> In terms of the Liquid payment.  We have collected (in terms of softing) about 190K, and Michael agreed for us to retroactively adjust the debit interest to the beginning of the month of March, to make up the difference on that.  SO we should be able to make that payment on Monday.  We need the instructions ASAP, so I can make that request first thing on Monday my time, to ensure it gets there same day.  If not, it might not get to Liquid until Tuesday.
>
> What is the second payment for?  Please keep in mind, the account has been on margin call for a week or so.  When we agreed to the loan from Diamond, we layed it out very specifically, that those funds had to stay internal to GPP in Quant X, yet there have been a number of payments out, leaving the Net Equity in Quant X down to $4.5m (it was at $9m).  Now we need to pay out another $250K?  I think we have worked very hard to make all of this work as business partners and have gone above and beyond what any reasonable firm would do.  I think I am spot on when I say, CS would not have done any of it, but maybe I am wrong.

139.    On April 9, 2014, Liquid filed the S-1 Registration Statement with the SEC announcing the proposed secondary offering.  Of course, the statement made no mention of the Company's ongoing problems with QuantX, its largest customer, which continued to intensify.

140.    On April 14, 2014, Shifrin emailed Storms to advise him that he had spoken to Ferdinand about the fact that QuantX still owed Liquid the amounts due for February 2014, which were in excess of $263,000.  In addition, according to Shifrin, "the agreement for Risk enterprise was to bill $250k at the beginning of a quarter."  Shifrin wrote that "[t]hese amounts would be nice to collect," because Liquid did not "need issues with KPMG on the bring

27

down"—meaning that when KPMG requested current information to bring its audit up to date, problems would arise if Liquid could not show that QuantX had paid these amounts.

141.    After forwarding Shifrin's email directly to Ferdinand, Storms responded to Shifrin by complaining that although he had seen the billing updates provided to Ferdinand, he had not seen anything "concerning the Enterprise Risk payments."  Storms questioned why these were not included in the note to Ferdinand.  Shifrin shot back that "It's all been invoiced to QuantX," and "all I keep doing is sending reminders…I shouldn't have to do that.  This is ridiculous…we have a system in place for a reason…They know what they owe.  We have enough to do."

142.    On April 18, 2014, Ferdinand resigned from the Company's Board and from his position as Head of Corporate Strategy.  In connection with his resignation, Ferdinand and his affiliated entities entered into a lock-up agreement with the Company, pursuant to which he agreed not to sell or transfer of his Liquid shares for a one year period.

143.    Ferdinand also signed a Consulting Agreement with the Company, pursuant to which he agreed to provide services to Liquid as an "independent contractor" including assisting with business development efforts, developing strategy for products, marketing, partnerships and M&A, and supporting Liquid's sales and marketing team.  In return, Liquid agreed to pay Ferdinand $37,500 per month.

144.    Ferdinand remained at the helm of QuantX and in constant contact with Storms.

145.    Attempting to address the severe liquidity problems plaguing both companies, on April 21, 2014, Ferdinand emailed the senior finance officials at Liquid and QuantX (including Storms, Shifrin and Tew) regarding the outstanding software bills, writing that "[a]fter we get

through today's last fire drill on the late payment," the parties needed to sit down and "fully

reconcile the QX bills" by auditing them to users.  Ferdinand stated that once this was done,

QuantX would "get 30 days ahead of the bills" because "[w]e can't keep having arrears if we are

going to be strategic partners building each others businesses."  Ferdinand continued by

explaining:

> The Liquid platform is the backbone of the QX business and while it is a
> substantial customer it also has an obligation to pay on time and be a good partner
> to Liquid.  We need to put these timing issues to bed once and for all.
>
> We all value each other a great deal and both companies benefit from each other.
> We just need to act like partners and make this a more manageable relationship
> for all involved so we can help grow each other.

146.    Alex Masotti, QuantX's Chief Operating Officer, wrote back in agreement,

explaining that "[p]art of the problem to date has been a liquidity issue."  Masotti further

explained that his "goal" was "to make QuantX a profitable, self sustaining, stand alone

business."  Needless to say, as everyone on the email knew, QuantX – which was still by far

Liquid's largest revenue source – was neither profitable nor self-sustaining, and never would be.

147.    With respect to the past-due February receivable, Masotti promised to "work with

[Global Prime Partners] to free up capital so that we can get this taken care of."

148.    On April 28, 2014, Liquid issued financial forecasts, and scheduled a call for the

next day with analysts at JPM Securities, an investor relations firm, to discuss the forecasts.

Early in the morning on April 29th, Storms emailed Shifrin to complain that he had just had

"[a]nother sleepless night" because he was "trying to understand how we could send off financial

forecasts yesterday without reconciling them to the detailed and laborious process we just went

through to get these banks [involved in the secondary offering] comfortable with our numbers.

The pipeline and deal count you forwarded yesterday was never compared to our base case we

just completed." Storms then forwarded this email to Ferdinand, with a note criticizing Shifrin:

"Same pattern no excuse. It's a shame because he tries real hard but consistently falls short."

Then, reflecting further on the fact that they were all knowingly misrepresenting the facts,

Storms continued: "To be fair he is trying to make numbers appear accurate when we all know

we are stretching big time."

149.    Despite Ferdinand's promise in April that QuantX would get ahead of its bills, it

only fell further behind. On May 13, 2014, Storms emailed Masotti, copying Ferdinand: "The

QX receivable is building quickly and we are now behind as previously discussed. I have to

produce audited results to close out our secondary offering and this will be a major issue. Please

let me know how we will resolve this ASAP."

150.    Ferdinand responded that the problem "may have to be handled one last time.

Alex may have to handle with GPP. Can jeopardize the secondary as we know."

151.    Storms and Ferdinand then switched to text messages to discuss the problem.

Storms texted:

> I copied you on my note to Alex [Masotti] as you have asked but we are quickly
> moving into a problem as QX is falling behind on payments. As you have told
> me there is work to do but we also have assurances that this will be resolved. I
> am sensitive to the challenges but as we have discussed multiple times we have to
> stay on top of this. Hopefully you are in tomorrow so we can resolve.

Ferdinand texted back:

> There is a lot of work to do to get QX into a non monthly payment cycle that has
> a detriment to its own cash causing it to Lower managers and is consistent with its
> own with GPP reconciliation of soft dollars, payout to its own managers, and
> causes losses because you have to reduce the book in volatile times to pay for
> [L]iquids needs that are inconsistent with anything QX is set up for from a timing
> perspective. I'm sure Alex will handle it but it all needs to be fixed and
> addressed.

152.    Masotti then emailed Ferdinand to preview the response he planned to send to

Storms:

> Brian,
>
> I am cognizant of our commitments and committed to meeting those obligations.
> However, we have to be very careful not to destroy our business in the process.
> The downward pressure on your stock has had a direct impact on us.  And the
> performance of our managers in this market environment has not helped the
> situation.  To continue to reduce the book to meet these obligations over the short
> term will only exacerbate the situation and compound the problem.  To use your
> metaphor, we are being VERY careful not to cough so as not to cause you a
> pneumonia (and perhaps our own demise).
>
> I am not being fatalistic to alarm you, but rather to emphasize how closely we are
> managing the situation and how measured we are in making any capital outlays
> during this period.
>
> For your audit purposes, we can agree to a payment plan that will satisfy the
> bankers, but I wanted to be transparent with you as to the reality of the situation.

153.    The next day, May 15, 2014, Liquid publicly announced that it had completed the

secondary offering by selling 32 million shares at $1.25/share.  This pricing represented a 45%

discount to the then-current market price of $2.30/share.  The announcement sent the market

price plummeting.

154.    The completion of the secondary offering did nothing to alter Liquid's failing

trajectory.  Only a week later, Storms and Ferdinand found themselves discussing the same old

problems.  Storms wrote to Ferdinand on May 23, 2014:

> We have a real challenge given the number of clients who have either stopped or
> are suspended.  We can't include them even if payments were still being made by
> QX.  In addition the quarterly nut is also now under pressure as well as new client
> growth.
>
> Obviously most but not all of this can [be] addressed by new capital soon but
> Liquid's revenue picture will be severely disrupted by the unfortunate
> circumstances.

155.    Indeed, both companies remained in essentially the same precarious position they had been from the beginning – looking to Von Allmen's money to sustain the fiction.

156.    On June 16, 2014, Ferdinand sent an email to Von Allmen, copying Storms's personal email address, entitled "Timing Issue / Bridge / Last ask."  He wrote:

> Doug,
>
> We are currently in another situation, very likely the last, that could be a real disappointment if it was to happen.  Liquid has secured itself and in doing so has created expectations to the street based on it's [sic] dependency to QuantX.  The real positive is they have finally begun to move away from that dependency but utilize it for what it was intended for; a strategic outlet not it's [sic] sole dependency.  We will probably see a shift from 75%/25% dependency on QX to 25%/75% away from QuantX over the next two quarters.  This will create tremendous independent growth and investment traction in the stock.  Brian S can attest that some of the investors wanted to avoid the stock until the dependency was lessened.  Once this happens we should see significant upside in the stock.
>
> It was necessary as a public company to show the growth and the strategy was the right one due to us going public in our opinion at such an early stage of the companies [sic] history while we built out the connectivity, strategic partnerships, and further developed the products.
>
> Today, QuantX is stretched on margin.  Running a large portfolio to support Liquid's business (80+ managers), leverage on the portfolio from the prime broker has been reduced by more than half because of the environment (hedge fund index -5/6%), and it needs to meet it's [sic] quarterly obligations to managers (roughly 85) and therefore Liquid without reducing the portfolio or the managers will likely leave if they don't have their allocations or are paid on time.  It is our preference not to take that risk.  I have a clear line of sight on closing out the capital round ($10mm+) which will ensure WE don't ever need capital again from you and will be able to grow the business independently moving forward away from our capital.  Brian S is committed to investment into QuantX along with most if not all the Liquid board and other key Liquid investors.  QuantX needs a $2.2mm bridge loan by months end (maybe the first few days of July) the latest but much preferred by quarter end for revenue recognition purposes or it will have negative impact to Liquid's reporting quarter.  It is to meet manager payouts and keep the book at it's [sic] current level and get the remainder of the managers to their full allocations so they become a paying customer.  Please let me know what you would like to do or if you can help.  If we can obtain the bridge we will certainly be in a strong position and above expectations.

My condo sale is progressing.  I am currently trying to refinance my homes to pull cash out for this, and have put everything I have into Liquid and QuantX, in addition, having people owe me millions like you.  I cannot control the timing of when these funds come in.  Brian S is selling a portion of APX (in July) as well to free up personal capital and put into QuantX and be able to see the new few years through at Liquid in a secure financial position.  The new structure to take in outside capital may not be ready till July for new outside investors (in progress) and I don't know what else to do besides ask you.  This gets us done and is the last of what we truly believe gets us through to long term success for both businesses.

Myself or Brian are available to speak anytime.  If [sic] would be a major disappointment and unfortunate circumstances to have gotten this far and have something breakdown now that could possibly impact Liquid this severely.

It would be a loan that would be paid back from the new QuantX structure once it's up and running and cash flowing or you could convert it to investment.  Once again, I am left out on my own to come to you again for something for the benefit of everyone.  The viability and independent traction Liquid is getting is impressive and will result in stock price improvement over time.  QuantX on it's [sic] own produces great returns and as the Liquid dependency decreases it will start to produce dividends to you quarterly.  My confidence is very high both pieces come together but this is needed to get us to the final stage.  I'm sincerely sorry I have to ask for this last piece but the upside still remains.  This is a very uncomfortable thing to ask for as we appreciate all you have done for us and this company.

Best regards,

Brian's [sic]

157.    Von Allmen answered Ferdinand's appeal, and on June 20, 2014, wrote back that "If you still need the full $2.2mm on 7/1 I can provide it.  Please let me know and if the last $200,000 should be wired to QX."  Ferdinand immediately replied that "The full $2.2mm will be helpful.  It is all being sent to QuantX."

158.    Von Allmen's money did not remain with QuantX for long.  The majority of the $2.2 million was paid over to Liquid on June 30, 2014.

159.    Liquid's overlap with and dependence upon QuantX also proved problematic when John Carroll, a trader who worked with both Liquid and QuantX claimed entitlement to both unpaid wages from QuantX and stock compensation from Liquid.  In June 2014, the myriad parties implicated in this dispute – which included not only Carroll, QuantX and Liquid, but Ferdinand (both personally and several of his entities), Tew, Gamberale, and Von Allmen (personally, as well as via several entities) – entered into a settlement of Carroll's claims.  The settling parties agreed to pay Carroll $390,000, with payments due to come in periodic installments from Liquid, QuantX and the Ferdinand entities, and Von Allmen.

160.    Liquid was responsible for the first payment and made it.  A second round of payments came due on July 31, 2014: $37,500 from Liquid, $32,500 from Von Allmen and $40,000 from QuantX and the Ferdinand entities.  When Liquid's General Counsel, Ibietatorremendia, emailed QuantX to confirm that it would be making its required payment, Ferdinand wrote back that it would not do so because QuantX "doesn't have the cash on hand." Liquid – which was jointly and severally liable to Carroll for the full amount of the settlement – was forced to make the payment to Carroll on QuantX's behalf.

161.    A third round of payments to Carroll were due on August 31, 2014, and the problem recurred.  Just as before, Ibietatorremendia wrote on August 29, 2014 asking for confirmation that QuantX would make its required payment.  Predictably, QuantX responded that it would not.  Masotti wrote back: "Unfortunately, we do not have the funds/liquidity to make this payment."  An exasperated Storms replied to all: "The lack of integrity in these dealings is appalling.  I assume this gets resolved between John Carroll and QX."

162.    Unfortunately for Liquid, QuantX's inability to pay was its problem as well – as Storms certainly knew it would be when he agreed to make Liquid jointly and severally liable for the entire settlement.

163.    Yet again, Liquid agreed to make up QuantX's portion of the settlement payment, paying another $25,000 to Carroll on QuantX's behalf.  Before doing so, Liquid asked for and received QuantX's promise to repay the money to Liquid, but Liquid knew this promise was illusory.

164.    This issue reared its head again in September, when Ibietatorremendia asked for confirmation that QuantX would be making its portion of the September payment to Carroll. Ferdinand fired back with a nasty email, writing "I assume the $1.3mm quarterly bill [owed by QuantX to Liquid] is equally as important [as the $30,000 owed to Carroll].  Let's get some perspective here please."  Ferdinand then launched into a rant about what Liquid and QuantX really should be doing to solve their problems.  He concluded: "Let's speak in reality with all cards up on the table as we move forward.  QuantX is in a very fragile [state] due to [L]iquid's dependency on them.  We are ho[ld]ing a pair of 2's against 4 aces."

165.    After reading Ferdinand's missive, Storms – who often warned Ferdinand to watch what he put in writing – wrote back only to Ferdinand with an admonition: "Really poor judgment sending this and copying so many people.  Can's seem to make you understand we are a public company and have disclosure issues to deal with.  How about using a phone"

166.    By this time, the illusion of legitimacy was becoming impossible to sustain.  In a cost-cutting move, on September 17, 2014, Liquid announced it was switching auditors from KPMG to Grant Thornton.  The decision to do so had been made about a month earlier, in mid-

August.  In an email he sent to Peter Kent on August 20, 2014, whom Storms was recruiting Kent to become Liquid's new CFO (Liquid had also determined to fire Shifrin), Storms wrote that KPMG's "fees have become excessive for a firm our size and quite frankly they never should have been chosen."

167.    Just after announcing the change in auditors, Liquid announced that two of the Company's directors, Davy and Ross, had resigned.  These resignations were also attributed to cost cutting.

168.    The intractable QuantX problem refused to go away.  On October 22, 2014, Storms emailed Shifrin (who by this time was just playing out the string while the Company attempted to find the best time to announce his ouster) regarding the QuantX receivable.  He wrote that "the auditors are here" and he had not "seen any additional QuantX money."  In addition to the past due receivable for September 2014 of $487,000, he was promised a third of the October balance, which amounted to another $120,000.  Storms noted that the overdue $487,000 included $50,000 Liquid had paid for the Carroll settlement on QuantX's behalf.

169.    Two days later, on Friday, October 24, 2014, Liquid announced Shifrin's resignation as CFO.  On October 27, 2014, the ensuing Monday, Shifrin was replaced by Peter Kent.

170.    The following day, October 28, 2014, Defendant Bernstein resigned from the Board.

171.    At the end of the month, with another round of settlement payments due to Carroll, Ibietatorremendia assumed that QuantX would not make its share of the payment on time, and therefore offered to have Liquid make the payment, but wrote to ask for a commitment

from QuantX that it would repay Liquid at the end of November.  Masotti candidly wrote back: "Unfortunately, we will not be able to make that payment."

172.    Despite this string of unequivocally bad news, on October 30, 2014, Liquid issued an earnings press release that painted a picture that was far from reality.  The release stated that as of September 30, 2014, Liquid had 129 customers, 95 of which were contributing to GAAP revenue and 34 of which were under contract and expected to contribute to future revenue. These numbers were essentially flat from the prior period, when Liquid allegedly had 130 customers, 97 contributing revenue and 33 expected to do so.  At subsequent disclosures would demonstrate, these numbers were not only false, but blatantly so.

**As the Façades of Liquid and QuantX Crumble, the Walls Close in on Ferdinand and Storms**

173.    In addition to the pressure they faced running their respective companies, Ferdinand and Storms also confronted mounting personal financial distress.

174.    Back in May 2013, not long after joining Liquid, Storms had borrowed $5 million from one of Keller's entities, which he used to purchase Liquid stock.  Liquid's S-1 Registration Statement falsely characterized this loan as a stock sale.

175.    In addition, in March 2014, Storms borrowed an additional $1.1 million from Ferdinand, so that he could pay the taxes he owed on account of restricted stock units he received in connection with his employment.  This supposedly was done to avoid the need for certain tax-related disclosures to be made.

176.    When Liquid conducted its secondary offering, Storms borrowed another $200,000 from Von Allmen to purchase shares in the open market.

177.    In June 2014, when Storms was contemplating the sale of a portion of his ownership interest in an unrelated company called APX, Inc., Ferdinand wrote to him asking that he "repay the $1.1mm prior to closing on your deal."  Ferdinand said "it would be very helpful to take the stress off me and QX in the short term.  Very challenging times to me and this venture." And while he appreciated Storms's "commitment to invest capital in QX after the sale [of APX]," he nevertheless needed "to point out how everything is interconnected."  Storms replied that he was "not sure how I have not been clear in my capacity to repay prior to closing the APX transaction," but he was "facing significant liquidity issues personally right now so it is impossible to repay until APX closes."  Storms continued that if he "had any idea this would become a weekly discussion," he "would have forfeited the stock issuance as [he had] suggested."  And "with all the pressure we have created due to QX and public company status combined with [Storms's] debt to [Ferdinand] and Rob [Keller] it's becoming increasingly difficult to find the motivation to stay focused….No matter how hard I try we spend every day worrying about the same issues."

178.    On September 26, 2014, Storms wrote to Von Allmen to tell him that he had "reached an agreement to sell some of [his] commercial real estate in Southampton and plan[ned] to repay the loan [Von Allmen] provided to purchase stock within the next 60 days or so."

179.    On October 2, 2014 Storms wrote to Keller regarding the $5 million loan.  He began by noting "I am purposely using my personal email for this discussion."  Storms recounted the history of his dealings with Keller, stating that in addition to borrowing the money from Keller to purchase 766,000 shares, he "also purchased stock from Rich [Schaeffer] and Brian [Ferdinand] at equally high valuations.  In addition, the RSU's [he] received as CEO were

calculated at the market valuation at the time of our IPO and subsequently created a significant tax burden [due] to the phantom income generated." He then proposed to restructure the loan by using the secondary offering price of $1.25 as a share, which yielded a total of $957,500, which Storms "would agree to increase … to $1 million," and then "make a payment … by year end of 20 to 25% and follow the same guidelines we used in the original agreement as it relates to the balance."

180.    Keller eventually agreed to restructure the note by reducing the balance from $5 million to $1.25 million and accept a lump-sum payment of the full amount.

181.    On October 8, 2014, Schaeffer sent a text message to Storms stating "I hav [sic] no way out liquid missed quarterly project by 20 customers projected 25 only signed 5[.]"

182.    On October 12, 2014, Storms borrowed another $1.1 million from Von Allmen, which he used to repay Ferdinand the money he owed from the March 2014 loan.

183.    The same day, Storms reached out to Defendant Suskind, who was the Vice Chairman of Bridgehampton National Bank, a community bank on Long Island, seeking to arrange a short-term loan he could use to repay Von Allmen. Suskind made a personal appeal on Storms's behalf to the bank's Chief Lending Officer, writing "I would appreciate if you could handle this personally."

184.    Storms eventually received a $2 million loan from Bridgehampton National Bank. He used a portion of the proceeds to repay the October 2014 loan from Von Allmen.

185.    Meanwhile, Ferdinand was facing his own personal financial crisis. In July 2014, he was sued by UBS for approximately $2.3 million owed on a line of credit. The line of credit was collateralized by a security interest in a portion of Ferdinand's Liquid shares.

186.    In September 2014, Ferdinand reached a settlement with UBS, under which he agreed to repay the full $2.3 million balance in five installment payments, which remained secured by a portion of Ferdinand's Liquid stock.

187.    At the time of the settlement, Ferdinand asked Liquid to release 771,000 shares from his Lock-Up Agreement, which the Company agreed to do.  The settlement agreement authorized UBS and/or Ferdinand to sell Liquid shares to make the required payments.

188.    Ferdinand's settlement with UBS also provided in pertinent part that if the price of Liquid stock fell below $1.10, UBS could accelerate the sale of the collateral and repay itself (a) first, by selling the shares already released from the Lock-Up Agreement, (b) second, by selling shares not yet released from the Lock-Up Agreement, subject to Ferdinand getting them released, which he was obligated to use his best efforts to obtain.

189.    Liquid's share price fell below $1.10 on October 8, which caused UBS to sell 600,363 of Ferdinand's Liquid shares.  This put Ferdinand in breach of the Lock-Up Agreement, because together with the shares previously sold, the total sales exceeded the amount that had been released from the Lock-Up Agreement.

190.    Ferdinand asked Liquid to: (a) amend the prior release from the Lock-Up Agreement to increase the number of shares released from 771,000 to 896,000 to cover the shares already sold; and (b) to release an additional 1.2 million shares to allow UBS to sell them to satisfy the remaining unpaid balance of $1,234,000.

191.    Liquid's Board considered Ferdinand's request at a meeting held for that purpose on October 13, 2014.  The Board ultimately approved releasing 125,000 shares from the Lock-

Up Agreement to cover the over-sell, as well as an additional 375,000 shares, to be sold over not less than 20 trading days with no more than 20,000 shares sold in a single day.

192.    In connection with this agreement from Liquid's Board, Ferdinand used the $1.1 million loan repayment he had just received from Storms (who had just borrowed the money from Von Allmen) to satisfy his obligations to UBS.

### The Ferdinand-Storms Relationship Breaks Down and QuantX Finally Concedes Insolvency, Which Exposes the Liquid Fraud

193.    Peter Kent, recently hired as Liquid's CFO, began his tenure by investigating the issues confronting the Company.  On November 2, 2014, Kent emailed Storms his findings on a number of topics, including Liquid's relationship with QuantX, which Kent described as "the biggest surprise…they are a major problem.  My impression over the first week is that they are in serious trouble.  They owe us a lot of money.  The Ferdinand relationship is quite problematic."  Of course, none of this was news to Storms, who remained in daily contact with Ferdinand and had known of QuantX's financial problems (and their potential to seriously impact Liquid) for months, if not years.

194.    With the newly-hired Kent driving for an honest assessment of the situation, on November 6, 2014, Storms emailed Kent and Ibietatorremendia about the possibility of "needing more disclosure concerning QX's delayed payments."  Kent responded by suggesting that the three of them meet to discuss "[p]otential [e]arnings changes for QIII," "[r]equired subsequent public disclosures," and "[d]elay in filing of 10-Q," among other things.

195.    On November 10, 2014, QuantX's Masotti emailed Kent to tell him that QuantX would be making a payment of $250,000 by week's end and an additional $500,000 by year end, which "is the absolute maximum we can make at this point."  Later the same day, Masotti wrote

that with respect to that week's payment, QuantX "would like to wire $125K and put the remaining $125K on [its] corporate card," in order to "utilize much needed working capital this month."

196.    Kent responded that he had no problem with Masotti's proposal, as long as it was done the next day to ensure receipt, and as long as QuantX paid the credit card fee.  Kent then wrote separately to Storms: "Ok, so they are truly short of money – you can't make this stuff up."  Storms responded: "Incredible."

197.    In its publicly filed 10-Q for the period ending September 30, 2014, which Liquid filed on November 14, 2014, the Company represented that it had 95 customers using 670 Units, 401 of which were being used by QuantX.  In the document, Liquid added a warning about variability in QuantX's financial performance:

Accounts Receivable from QuantX

Accounts receivable from QuantX represents the balance due from QuantX Management, LLP (collectively with its affiliates, "QuantX") for the sale of our software services. QuantX is a related party as a result of certain past or present relationships with Brian Ferdinand (one of the founders of the Company) and Douglas J. Von Allmen (a holder of more than 5% of the Company's common stock). QuantX is the Company's largest customer and the receivable due from them accounted for 74% and 82% of our total net accounts receivable at September 30, 2014 and December 31, 2013, respectively. Subsequent to the balance sheet date, the Company received a total of $390,125 from, or on behalf of, QuantX towards their outstanding accounts receivable balance. Software services revenue earned from QuantX accounted for 61% and 65% of the Company's total software services revenue during the three- and nine-months ended September 30, 2014, respectively.

While QuantX represents a substantial percentage of our revenues and outstanding accounts receivable, they have historically settled their accounts with the Company in full. However, QuantX's business results are highly tied to the performance of their investment managers and the amount of capital under management. This can cause QuantX's revenues and cash flows, at times, to be quite variable. As a result, their payments to the Company can also be quite variable in amounts and timing. **As QuantX's results are highly tied to their performance in the marketplace, there can**

**be no assurance that future payments to the Company will be made on a timely basis or in full.**

(emphasis added).  This warning was totally inadequate to convey the dire state of QuantX's financial problems, of which Liquid was fully aware.

198.    By this point, Ferdinand had determined that he either could not or would not keep up the charade any longer, and that QuantX would not fulfill its obligations to Liquid – which Liquid would have no choice but to disclose and would inevitably lead to its economic ruin.

199.    As the relationship broke down, Storms and Kent attempted to quantify the amount of money Ferdinand had cost Liquid over the years.  They prepared a spreadsheet, which included (i) expenses Ferdinand charged to the Company, which amounted to $257,689; (ii) corporate credit card purchases, which amounted to $173,106; (iii) legal settlements and fees paid to resolve claims arising out of Ferdinand's conduct, which amounted to $1,024,659; (iv) cash payments made to Ferdinand and his entities pursuant to his employment and consulting agreements, which amounted to $1,452,418; and (v) the money paid to acquire LiquidView, which amounted to $1,000,000.

200.    In the process of preparing this spreadsheet, Storms emailed Kent that they needed "to include how much money Brian took out pre IPO through his inflated private sales of stock," which were "largely the basis for the hyper inflated valuation used for the IPO."  Storms wrote that "Brian and Rich Schaeffer took about $5 to $6 million out in the run up to the IPO. Many of our directors as well as dozens of friends including Doug bought at the high pre IPO level.  Not much has ever been said about that."

43

201.    Kent attempted on several occasions to reach out to Ferdinand to nail down QuantX's position on where the parties' relationship was headed, but Ferdinand largely avoided him and played mind games by sending cryptic and coded emails.  Commenting on one of Ferdinand's emails, Kent forwarded the conversation to Storms on November 25, 2014, writing "He is so Machiavellian."  Storms wrote back: "I think it's called sociopath!"

202.    With Ferdinand continuing to give every indication that he was prepared to allow QuantX to default and drive both companies off a cliff, Storms emailed Ibietatorremendia and Kent on December 9, 2014 with a draft email he was considering sending to Ferdinand, asking for their opinions on whether it might be "a worthy effort to try to bring Brian to his senses."  In the draft, Storms wrote:

Brian,

As it now appears that you are heading towards a course of action that will entail possible shareholder action and inevitably legal recourse, I thought it might be constructive to offer a perspective that might hopefully help us all avert what would likely be a debilitating period that would likely lead to the destruction of Liquid Holdings. Having spent close to two years working closely with you and experiencing first hand your approach to business and personal challenges I would only ask that you fully take stock of the past two years and try to find a solution that benefits all parties without destroying our promising business, shareholder relationships, and potential long term financial rewards for all concerned.

The decision to take Liquid public was made in early 2012 by you and Rich Schaeffer and shortly after arriving in Dec 2012 I implored you to reconsider. We had repeated discussions whereby I strongly urged you to take a different funding path and also not to place yourself in a public company fishbowl given the history and relationship issues you and Rich were facing. Despite these efforts there was no turning back. $10 million dollars was ultimately spent to take Liquid public. KPMG, Gibson and Dunn, Citric Cooperman and Sandler O'Neil were all chosen and paid millions of dollars to support this public decision before I arrived in Dec 2012. To my knowledge, one major advisor, Lazard was the only blue chip company to strongly advise against the public offering and as a result were rejected as a potential advisor.

44

Compounding this decision was the determination of valuation. Again, despite repeated efforts on my part and Sandler O'Neil you and Rich were determined that Liquid's valuation was at or above $200 million despite the fact that there was less then [sic] $2 million in revenue , all from related parties. Perhaps the most challenging aspect of this public company decision was the reliance you placed on Doug Von Allmen and his list of friends and family that were positioned to take up the entirety of the IPO. The regular communications with Sandler re affirming Doug's commitment led Sandler to conclude that they had very little responsibility for a true public offering, hence their failure to deliver pre qualified investors during the offering period. As the records show, Doug ultimately took up $18 million of a $28 million raise. Net proceeds after all IPO expenses were paid was approx $18 million.

Ibietatorremendia responded by discouraging Storms from sending the email to Ferdinand, and it was never sent.

203.    With no indication of a change in Ferdinand's position, Liquid prepared to go on the offensive against QuantX.  In mid-December 2014, Liquid had its lawyers prepare demand letters (a) requiring that QuantX and its affiliates pay the more than $1.7 million owed under the Technology Services Agreements with Liquid; (b) indicating that services would be suspended on January 8, 2015; (c) demanding payment on a term note due from QuantX; (d) demanding payment on a term note due from Ferdinand Capital; and (e) terminating Ferdinand's Consulting Agreement with the Company.

204.    These demand letters were served on December 23, 2014.  Concurrently, Liquid filed an 8-K current report with the SEC announcing the suspension of services to QuantX and the termination of the Consulting Agreement with Ferdinand.  This report also disclosed that as of September 30, 2014, QuantX (61%) and managers to whom QuantX allocated investment capital (34%) accounted for 95% of Liquid's software services revenue.  Liquid also reported that as of the date of the report it had only "25 customers independent of the QuantX relationship," of which a mere 7 were billed in the current quarter.

205.    These disclosures – that the relationship with QuantX on which the Company's forecasts and business prospects had been built was irreparably destroyed, and that its independent customer relationship and revenues were negligible – delivered a death blow from which the Company never recovered.

206.    Although the Company attempted to restructure itself independently of QuantX, these efforts proved futile.

207.    In February 2015, lawyers for Von Allmen – who, according to Storms, had invested almost $60 million into Liquid – came to Ibietatorremendia with allegations about misrepresentations that had allegedly been made to Von Allmen.

208.    Based on Von Allmen's allegations, the Board's Audit Committee commenced an internal investigation.  Liquid's lawyers at Gibson Dunn – who had represented Liquid since before the IPO – conducted the investigation.

209.    Concurrently, on February 11, 2015, Storms wrote Von Allmen "to express my sincere apologies for having to put you through this emotional roller coaster.  You have been a great supporter and friend and I truly wish we could solve this without all the stress I know this is causing you."  Von Allmen wrote back to thank Storms and expressed his displeasure with what Ferdinand had done:

> I cannot believe how Brian befriended me and how he has set me up when I trusted him so.  Everything changed overnight when Vic suggested I contact Alex to verify all my money was there.  I think I got his phone number from you and when I called and found out they did not have my money, I was in shock.  I know you kept saying "it has to be there", but Brian would not return my calls and that is when I knew for sure something was drastically wrong.  It all seems so premeditated.

210.    While the internal investigation was ongoing, on February 20, 2015, Zavarro, who chaired the Audit Committee, resigned from the board.

211.    Suskind replaced Zavarro as Chairman of the Audit Committee.

212.    At the same time, Liquid's management decided to force Storms out of the CEO role.  In an email on February 19, 2015, Kent delivered the message to Storms: "If you were to continue as CEO your management team would resign in mass.  You have burned the bridges with them.  They no longer have faith in your judgment and decision making abilities or leadership.  They do not trust you."

213.    On February 24, 2015, Liquid issued a press release announcing that its earnings release and the conference call regarding its 2014 fourth quarter and fiscal year-end results would be delayed.

214.    On March 1, 2015, Storms was removed from the CEO role and replaced by Kent, who also retained his position as CFO.  Storms nevertheless remained on the Board.

215.    On March 19, 2015, the Company received a document preservation notice from the SEC.

216.    In May 2015, after reviewing the investigative report prepared by Gibson Dunn, the Company's auditors at Grant Thornton demanded that the Audit Committee engage an independent law firm to conduct the investigation.  The Audit Committee acquiesced and hired Ballard Spahr, which had no prior ties to the Company.

217.    On May 28, 2015, Liquid issued a "Business Update" disclosing customer data for the periods ending December 31, 2014 and March 31, 2015.  This report disclosed that as of December 31, 2014, Liquid had only 7 customers contributing to revenue, using only 18 Units, and that, as of March 31, 2015, it had only 11 customers using 46 Units.

218.    The May 28, 2015 update also disclosed that after adjusting for the impact of QuantX's cessation of operations, Liquid had a mere 5 customers contributing to revenue as of September 30, 2014, and only 2 customers for the periods ended June 30, 2014 and March 30, 2014.

219.    Even accounting for QuantX's failure, however, the information contained in the May 28, 2015 update was impossible to reconcile with the previously reported customer data, which was fraudulently inflated.

220.    Due to the Company's inability to timely file reports with the SEC, it received notice in May 2015 that it was non-compliant with the NASDAQ listing requirements.

221.    On August 17, 2015, Liquid notified the SEC it was unable to file a quarterly report for the period ending June 30, 2015, due to the Audit Committee's ongoing investigation.

222.    On September 8, 2015, Storms resigned from the Board.

223.    Two days later, on September 10, 2015, the Audit Committee and the Board concluded that Liquid's financial statements for all periods ending September 30, 2014, could not be relied upon and required restatement due to accounting errors involving premature recognition of revenue from QuantX and other customers before collectability was reasonably assured, given significant uncertainty of collections from QuantX and QuantX-related customers, which management knew about no later than June 2014.

224.    Grant Thornton resigned as the Company's auditor on September 15, 2015.  It refused to approve Liquid's financial statements for the periods ending September 30, 2014, December 31, 2014, and March 31, 2015.

225. On September 24, 2015, Liquid released the findings of the Audit Committee's investigation. These confirmed, among other things, (a) that evidence showed Ferdinand and Keller had entered into an undisclosed pre-IPO agreement to give stock to Von Allmen for no consideration; (b) that what had been disclosed as a stock sale by Keller to Storms was actually a loan; (c) that Storms had borrowed significant sums of money from insiders Ferdinand, Von Allmen and Suskind's Bridgehampton National Bank; and (d) that the previously issued financial statements contained errors and could not be relied upon.

226. Liquid's stock was de-listed from NASDAQ on October 28, 2015.

227. The Company filed a chapter 11 bankruptcy petition on January 27, 2016. The case was converted to chapter 7 on February 25, 2016.

V. **THE CLAIMS**

**FIRST CLAIM – COMMON LAW FRAUD**
**(Against The Officer Defendants)**

228. Paragraphs 1 through 227, above, are incorporated herein by reference, as if restated in their entirety.

229. The Officer Defendants engaged in the wrongdoing alleged above with the intent to defraud and deceive Liquid and its creditors, for their own pecuniary benefit.

230. The Officer Defendants "cooked the books" of Liquid to prolong the Company's existence while they and others looted the Company to the tune of tens of tens of millions of dollars at the expense of Liquid and its creditors.

231. Among other things, each of the Officer Defendants:

a. Falsely represented to customers, potential customers and third-parties dealing with the Company that Liquid had developed cutting edge software that was fully

49

functional;

      b.      Took the Company public at a valuation that had no basis in fact;

      c.      Facilitated the recording of phony customers in order to create and

maintain the false appearance that the Company was successfully onboarding new clients

on a continuous basis;

      d.      Facilitated the booking of phony and inflated revenues derived from

phony customers, customers that were not actually receiving software services from the

Company, and/or were not paying the Company for services;

      e.      Facilitated the accounting misrepresentations identified above.

232.      The conduct of the Officer Defendants as alleged above constituted fraud and

deceit.

233.      As a result of the fraud and deceit of the Officer Defendants, Liquid has suffered

damages which have yet to be fully determined and quantified, but which exceed the sum of $50

million.

## <u>SECOND CLAIM – BREACH OF FIDUCIARY DUTY</u>
### (Against The Officer Defendants)

234.      Paragraphs 1 through 233, above, are incorporated herein by reference, as if

restated in their entirety.

235.      The Officer Defendants owed fiduciary duties to Liquid and its creditors,

including duties of care, loyalty and good faith.

236.      In the exercise of their fiduciary duties, the Officer Defendants were required,

among other things, to refrain from self-dealing, to manage Liquid in a fair, just and equitable

manner in the best interests of Liquid and its creditors, and to refrain from abusing their positions

of control to favor their own interests and/or those of their family and friends at the expense of Liquid and its creditors.

237.    The conduct of the Officer Defendants as alleged above constituted a breach by each of the Officer Defendants of his/her fiduciary duties to Liquid and its creditors.

238.    As a result of the breaches of fiduciary duty by the Officer Defendants, Liquid has suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $50 million.

## THIRD CLAIM – BREACH OF FIDUCIARY DUTY
### (Against The Director Defendants)

239.    Paragraphs 1 through 238, above, are incorporated herein by reference, as if restated in their entirety.

240.    The Director Defendants owed fiduciary duties to Liquid and its creditors, including duties of care, loyalty and good faith.

241.    The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves.

242.    The duty of loyalty is breached, *inter alia*: (a) when directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when directors "abdicate" their directorial responsibilities; and/or (c) when directors act in bad faith.

243.    The duty of due care is breached, *inter alia:* (a) when directors engage in an irrational decision making process; and (b) when the conduct of directors arises to the level of "gross negligence."

244.     Moreover, each of the Director Defendants on Liquid's Audit Committee had the further responsibility to ensure that adequate internal controls and reporting systems were in place and properly utilized to increase the likelihood that wrongdoing by management and others would be discovered in time to inform fellow board members and to initiate corrective action.

245.     The Director Defendants' intentional ignorance, abdication of their roles and directors, and/or willful blindness toward Liquid's improper transactions, system failures and accounting misrepresentations constituted breaches of the Director Defendants' fiduciary duties to Liquid and its creditors.

246.     The Director Defendants failed to establish adequate internal controls and acted with an intention and conscious disregard for Liquid and its creditors.

247.     The Director Defendants failed to monitor the activities of Ferdinand and the other Officer Defendants and, by doing so, facilitated the frauds and other wrongs perpetrated by the Officer Defendants.

248.     The conduct of the Director Defendants as alleged above constituted a breach by each of the Director Defendants of his fiduciary duties to Liquid and its creditors.

249.     As a result of the breaches of fiduciary duties by the Director Defendants, Liquid has suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $50 million.

## FOURTH CLAIM – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Sandler O'Neill & Partners, L.P.)

250.     Paragraphs 1 through 249, above, are incorporated herein by reference, as if restated in their entirety.

251.     Sandler had knowledge of the wrongful conduct of the Officer Defendants and the

Director Defendants, as aforesaid, and provided substantial assistance to the Officer Defendants and the Director Defendants in connection with their breaches of fiduciary duties to Liquid.

252.    The substantial assistance provided by Sandler included, but was not limited to: (a) facilitating the IPO at a valuation that it knew had no basis in fact; (b) soliciting investors to purchase shares in the fraudulent IPO; (c) disseminating investment materials that misrepresented the true state of the Company; (d) promoting and selling Liquid shares in the fraudulent secondary offering; and (e) providing financial cover and credibility in connection with Liquid's business.

253.    The conduct of Sandler, as aforesaid, constitutes aiding and abetting the Officer Defendants and Director Defendants' breaches of fiduciary duties and subjects Sandler to liability for the harm suffered by Liquid and its creditors.

254.    As a result of the wrongdoing of Sandler, Liquid suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $50 million.

## FIFTH CLAIM – AIDING AND ABETTING FRAUD
### (Against Sandler O'Neill & Partners, L.P.)

255.    Paragraphs 1 through 254, above, are incorporated herein by reference, as if restated in their entirety.

256.    Sandler had knowledge of the wrongful conduct of the Officer Defendants, as aforesaid, and provided substantial assistance to the Officer Defendants in connection with their commission of the frauds alleged herein.

257.    The substantial assistance provided by Sandler included, but was not limited to: (a) facilitating the IPO at a valuation that it knew had no basis in fact; (b) soliciting investors to purchase shares in the fraudulent IPO; (c) disseminating investment materials that

misrepresented the true state of the Company; (d) promoting and selling Liquid shares in the fraudulent secondary offering; and (e) providing financial cover and credibility in connection with Liquid's business.

258.    The conduct of Sandler, as aforesaid, constitutes aiding and abetting the fraud committed by the Officer Defendants and subjects Sandler to liability for the harm suffered by Liquid and its creditors.

259.    As a result of the wrongdoing of Sandler, Liquid suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $50 million.

### SIXTH CLAIM – AVOIDANCE OF TRANSFERS

**Pursuant to 6 Del. C. § 1304(a)(1), and 11 U.S.C. § 544**
**(Against Ferdinand, Keller, Schaeffer, the Ferdinand Entities, the Schaeffer Entities, and CMK)**

260.    Paragraphs 1 through 259, above, are incorporated herein by reference, as if restated in their entirety.

261.    At all times material hereto, Liquid had at least one creditor prior to making the Transfers.

262.    At all times material hereto, Liquid was insolvent.

263.    Liquid made the Transfers with the actual intent to hinder, delay and/or defraud the Debtor's creditors.

264.    Liquid did not receive reasonably equivalent value in exchange for the Transfers.

265.    The Transfers – made when Liquid was insolvent – constituted fraudulent transfers for which the Defendants are liable.

266.    Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. § 1304(a)(1), and Section 544 of the Bankruptcy Code.

## SEVENTH CLAIM – AVOIDANCE OF TRANSFERS
### Pursuant to 6 Del. C. §§ 1304(a)(2) & 1305(a), and 11 U.S.C. § 544
### (Against Ferdinand, Keller, Schaeffer, the Ferdinand Entities, the Schaeffer Entities, and CMK)

267.    Paragraphs 1 through 266, above, are incorporated herein by reference, as if restated in their entirety.

268.    At all times material hereto, Liquid had at least one creditor prior to making the Transfers.

269.    At all times material hereto, Liquid was insolvent.

270.    Liquid did not receive reasonably equivalent value in exchange for the Transfers.

271.    The Transfers – made for less than reasonably equivalent value when Liquid was insolvent – constituted fraudulent transfers for which the Defendants are liable.

272.    Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Section 544 of the Bankruptcy Code.

## EIGHTH CLAIM – RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550
### (Against all Defendants)

273.    Paragraphs 1 through 272, above, are incorporated herein by reference, as if restated in their entirety.

274.    The Trustee is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 548 and 544.

275.    The Defendants were the initial transferees of the Transfers, or the entity for whose benefit the Transfers were made or, alternatively, the immediate or mediate transferee of such initial transferee.

276.    Accordingly, the Trustee is entitled to recover the Transfers pursuant to Section

550 of the Bankruptcy Code.

## NINTH CLAIM – CORPORATE WASTE
**(Against the Officer Defendants, Director Defendants, and Defendant Keller)**

277.     Paragraphs 1 through 276, above, are incorporated herein by reference, as if restated in their entirety.

278.     The acquisition spree by which Liquid was assembled via the Transfers had no rational business purpose and was so commercially unreasonable that no business person of ordinary sound judgment could believe that Liquid received adequate consideration in exchange for the Transfers.

279.     As a result of the waste of Liquid's property, the Director Defendants and Officer Defendants are responsible for their respective roles and the damages associated therewith.

## VI.     RELIEF REQUESTED

WHEREFORE, Plaintiff, Alfred T. Giuliano, in his capacity as Chapter 7 Trustee for the jointly administered estates of Debtors Liquid Holdings Group, Inc. and Liquid Prime Holdings, Inc., demands the entry of judgment in favor of the Trustee, as follows:

(a)     Against the Officer Defendants, the Director Defendants, and Sandler, jointly and severally, for damages in excess of $50 million;

(b)     Against the Transferee Defendants for avoidance and recovery of the Transfers, or the value thereof;

(c)     Directing the Transferee Defendants to immediately pay the Trustee the amount of the Transfers, plus interest thereon and costs, and in connection therewith, enter judgment in favor of the Trustee and against:

       (1)       Defendants Keller and CMK, jointly and severally, for an amount to be determined;

       (2)       Defendants Ferdinand and the Ferdinand Entities, jointly and severally, for an amount to be determined; and

       (3)       Defendants Schaeffer and the Schaeffer Entities, jointly and severally, for an amount to be determined.

    (d)       Against the Defendants, jointly and severally, for punitive damages;

    (e)       For reasonable attorneys' fees and costs; and

    (f)       For such additional relief as this Court deems just.

## VII.   **JURY DEMAND**

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

Dated: June 30, 2017

                   /s/  David W. Carickhoff
                   David W. Carickhoff (DE 3715)
                   ARCHER & GREINER, P.C.
                   300 Delaware Avenue, Suite 1100
                   Wilmington, DE 19801
                   Tel: (302) 777-4350

                   and

                   KAUFMAN, COREN & RESS, P.C.
                   Steven M. Coren, Esq. (pro hac vice to be sought)
                   David M. DeVito, Esq. (pro hac vice to be sought)
                   Two Commerce Square, Suite 3900
                   2001 Market Street
                   Philadelphia, PA 19103
                   Tel: (215) 735-8700

                   Counsel for Plaintiff
                   Alfred T. Giuliano, Ch. 7 Trustee

212828375v2