## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIQUID HOLDINGS GROUP, INC., *et al.*, | ) | Case No. 16-10202 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| ALFRED T. GIULIANO, in his capacity as | ) | |
| chapter 7 trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 17-50662 (KG) |
| | ) | |
| BRIAN FERDINAND, BRIAN M. STORMS, | ) | |
| RICHARD SCHAEFFER, KENNETH D. | ) | |
| SHIFRIN, JAY H. BERNSTEIN, DARREN | ) | |
| C. DAVY, DAVID R. FRANCESCANI, | ) | |
| WALTER F. RAQUET, THOMAS R. | ) | |
| ROSS, VICTOR R. SIMONE, JR., DENNIS | ) | |
| A. SUSKIND, ALLAN B. ZAVARRO, | ) | |
| SANDLER O'NEIL & PARTNERS, L.P., | ) | |
| FERDINAND HOLDINGS LLC, | ) | |
| LT WORLD LIMITED, LLC, | ) | |
| ROBERT KELLER, CMK HOLDINGS, LLC, | ) | |
| SCHAEFFER HOLDINGS, LLC, | ) | |
| and SHAF HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | **Re: D.I. 66, 68, 70, 73, 77, 82, 85** |

## OPINION[1]

Alfred T. Giuliano, in his capacity as chapter 7 trustee (the "Trustee"), brings this

adversary proceeding against Brian Ferdinand ("Ferdinand"), Brian M. Storms

---

[1] The Trustee has demanded a trial by jury and does not consent to the Court's entry of a final judgment. However, in deciding a motion to dismiss, the Court is not required to state findings of fact or conclusions of law. Bankruptcy Rule 52(a)(3).

("Storms"), Kenneth D. Shifrin ("Shifrin") (Ferdinand, Storms and Shifrin collectively, the "Officer Defendants"), Jay H. Bernstein ("Bernstein"), Darren C. Davy ("Davy"), David R. Francescani ("Francescani"), Walter F. Raquet ("Raquet"), Thomas R. Ross ("Ross"), Victor R. Simone, Jr. ("Simone"), Dennis A. Suskind ("Suskind"), Allan B. Zavarro ("Zavarro") (Schaeffer, Bernstein, Davy, Francescani, Raquet, Simone, Suskind and Zavarro collectively, the "Director Defendants") and Robert Keller ("Keller") in their individual capacities as officers and directors of Liquid Holdings Group, LLC ("Liquid" or the "Company"). The Trustee additionally brings this action against Sandler O'Neil & Partners, L.P. ("Sandler"), Ferdinand Holdings LLC, LT World Limited, LLC, CMK Holdings, LLC, Schaeffer Holdings, LLC and SHAF Holdings, LLC (together with all other parties listed above, the "Defendants"). The Trustee claims that through lopsided acquisitions, a fraudulent initial public offering (the "IPO") and a fictitious recording of revenue and customers, Defendants intentionally perpetuated the illusion of Liquid as a financially viable entity while looting the Company for their own benefit.

Defendants moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7012 (the "Motion" or "Motions"). There are seven Motions on behalf of the Defendants.

**Facts[2]**

Company Formation and Growth

On January 17, 2012, Ferdinand, Schaeffer and Keller (collectively the "Founders") created Liquid to act as a holding company that could provide integrated trading, risk management and accounting tools to the financial services community.[3] Compl. ¶¶ 27, 30, 105.  To grow the Company and eventually push it toward the IPO, the Founders began in earnest to acquire entities. Compl. ¶ 30.  Between April 2012 and September 2012, Liquid acquired eight separate entities (the "Acquisition Spree")[4]. *See* Compl. ¶¶ 32-83.  Following the Acquisition Spree, each entity acted as a subsidiary to Liquid as it prepared to consummate an initial public offering. Compl. ¶¶ 81-83.  To properly prepare for the IPO, Liquid hired Storms as its CEO on December 1, 2012. Compl. ¶ 83.

From its inception, Liquid relied heavily on money from two sources.  The first source was QuantX, a company which operated by allocating capital to certain investment managers who would then make investment decisions and be paid a percentage of the profits.[5] Compl. ¶¶ 84-86.  QuantX was Liquid's primary customer

---

[2] For purposes of the Motions, the Court will accept all well-pleaded facts as true, but may disregard any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d. Cir. 2009).

[3] Liquid's founding members were entities controlled by the Founders, with Schaeffer Holdings, LLC (controlled by Schaeffer) owning 12.96%, SHAF Holdings LLC (controlled by Schaeffer) owning 10.67%, Ferdinand Holdings (controlled by Ferdinand) owning 39.43% and CMK Keller Holdings (controlled by Keller) owning 39.43%. Compl. ¶ 28.

[4] The entities acquired in the Acquisition Spree were: Liquid Partners, LLC; Liquid Futures, LLC; Liquid Prime Holdings LLC; Liquid Trading Institutional LLP; Green Mountain Analytics, LLC; Fundsolve Limited (UK); LHG Technology Services LTD (Mauritius); and LTI, LLC. *See* Compl. ¶¶ 32-83.

[5] QuantX was a customer of Liquid's from early 2012 to December 2014.

throughout nearly the entirety of Liquid's existence, accounting for upwards of 75% of Liquid's software licensing revenues at times. Compl. ¶¶ 90, 94.

Liquid obtained its second source of money through investments primarily from one individual, Douglas Von Allmen ("Von Allmen"), who engaged in several transactions with Liquid in return for shares of the Company. Compl. ¶ 96-97. This relationship began in June 2012 with Von Allmen signing a $12.5 million subscription agreement for 1,239,986 shares of Liquid stock. Compl. ¶¶ 96-97.

Liquid's Initial IPO

With funding from Von Allmen and an alleged customer base in place, Liquid sought to raise capital by filing its initial S-1 in contemplation of an IPO on April 11, 2013.[6] Compl. ¶ 105.  In its S-1, Liquid made the following representations:

i.   Liquid has developed and provides proprietary next generation technology that seamlessly integrates trading, real-time risk management, accounting reporting and administration tools in a single platform for the financial services community.

ii.   Liquid has "current and prospective customers" which include "small to mid-size hedge fund managers, asset managers, wealth management offices, family offices and financial institutions."

iii.   During the period from April 24, 2012 through December 31, 2102, Liquid had revenues from software licensing of $1,000,000, and had 24 licensee-customers paying fees for 350 "units" consisting of individual elements of the Liquid technology platform.

iv.   Of the 350 fee-generating units, 290 were being used by QuantX.

Compl. ¶ 105.  On July 9, 2013, Liquid filed an amended registration statement with the SEC indicating a Proposed Maximum Offering Price of $63.25 million for 5 million shares,

---

[6] Sandler served as the sole underwriter for the IPO. Compl. ¶¶ 20, 202.

representing $12.65 per share. Compl. ¶ 107.  Two days before the IPO, Liquid dropped its proposed offer to $53.13 million for 4.2 million shares through a second amended registration statement, still representing $12.65 per share. Compl. ¶ 108.  Liquid's IPO opened on July 26, 2013, and closed on July 31, 2013. Compl. ¶¶ 111, 114.  Through the IPO, Liquid sold 3,175,000 shares at $9.00 per share, yielding $26.7 million. Compl. ¶ 111.  In total, Liquid received net proceeds of $17.3 million (following commissions and offering-related expenses.)[7] Compl. ¶ *See* Compl. 111-17. Of the $26.7 million, Ferdinand and Von Allmen purchased $16.2 million worth of shares. Compl. ¶ 112.  Moreover, Von Allmen and Liquid entered into a pre-IPO agreement (the "Pre-IPO Deal") in which Von Allmen received an additional 732,292 shares at no cost, bringing his total purchase price down to $6.31 per share. Compl. ¶ 113, 118.  Following payment to company insiders to repay loans, stock repurchases, etc., Liquid was left with $14.76 million, far below the $60 million number it anticipated. *See* Compl. 111-17.

Post-IPO Reliance on QuantX

Notwithstanding the disappointing IPO, Liquid reported in its second quarter 10-Q that the total Units used by customers had risen from 351 to 385 (despite the customer base falling from 25 to 23)[8]. Compl. ¶ 121.  Of the 385 Units, QuantX accounted for 79%. *Id.*  The apparent positive trend in customer growth continued through Liquid's third

---

[7] During Liquid's IPO, Thomas Ryan and John Lugano brought a lawsuit against Liquid in New York state court (the "Ryan Suit"), alleging fraudulent dealings and misrepresentations on the part of Liquid and Ferdinand. Compl. ¶ 109; *see Ryan v. Liquid Holdings Grp.*, 2014 WL 3373438 (N.Y. Sup. Ct. July 3, 2014).

[8] "Units" refers to an individual element of Liquid's technology platform licensed to an entity. Compl. ¶ 105(d).

quarter, where on November 14, 2013, it reported the customer base increased from 23 to 27, with total Units increasing from 385 to 455. Compl. ¶ 124. Again, QuantX accounted for a high percentage of Units, this time representing 83%. *Id.*[9]

As Liquid progressed into 2014, it began to see the dangers of its reliance on QuantX. On February 4, 2014, Shifrin emailed Storms to inform him that Liquid was about to request payment from QuantX for the December 2013 receivable, which had not been satisfied. Compl. ¶ 132. On March 28, 2014, Storms wrote to Ferdinand stating that QuantX had an outstanding payment of $500,000 due to Liquid. Compl. ¶ 137. Ferdinand responded by telling Storms that QuantX was "having a terrible quarter and will break if it's stretched any further[,]" to which Storms replied that QuantX was "a major piece of [Liquid's] revenue and if it's really month to month combat then [Liquid has] a major problem." *Id.* The QuantX issues were apparent to Ferdinand, who was informed that equity in QuantX was down to $4.3 million, notwithstanding the $500,000 on call and a cross-guarantee of a $4 million loan to one of Ferdinand's affiliated entities. Compl. ¶ 136. On April 14, 2014, Shifrin again emailed Storms advising him that QuantX still owed Liquid $263,000 from receivables in February, as well as a $250,000 risk enterprise fee due at the beginning of each quarter. Compl. ¶ 140. Storms responded with concerns regarding the enterprise risk payments, which he believed had not been paid, and that it should not be a day to day responsibility of Liquid's to inform QuantX of what it owed. Compl. ¶ 140-41.

---

[9] On December 23, 2013, shortly after Liquid's third quarter 10-Q, Schaeffer resigned from the Board. Compl. ¶ 126.

Due in part to the fracturing relationship between QuantX and Liquid, Ferdinand resigned from Liquid's Board and from his position as Head of Corporate Strategy on April 18, 2014, but agreed to provide services to Liquid as an "independent contractor" going forward while remaining at the helm of QuantX.  Compl. ¶ 142-44.  Upon his resignation, Ferdinand agreed to a lock-up agreement (the "Lock-Up Agreement") with Liquid indicating he would not sell or transfer any of his Liquid shares for a one-year period. Compl. ¶ 142.  Despite devoting nearly all of his attention to QuantX, Ferdinand was not able to help the company meet its required payments, and QuantX continued to fall behind. *See* Compl. ¶¶ 148-152.

Liquid's Attempt to Raise More Capital

With QuantX continuing to miss payments, Liquid sought to raise capital elsewhere and issued a second IPO (the "Second IPO") on May 15, 2015. Compl. ¶ 153. Liquid sold 32 million shares at $1.25 per share, representing a 45% discount to the then-current market price of $2.30 per share. *Id.*  The Second IPO did nothing to solve Liquid's liquidity issues, and in fact sent the market price of Liquid's stock plummeting. *Id.*  Liquid responded by attempting to cut costs in other ways such as switching audit companies (from KPMG to Grant Thornton) and asking Davy and Ross to resign from the Board. Compl. ¶¶ 166-67.  Liquid also fired Shifrin on October 24, 2014, replacing him with Peter Kent ("Kent"). Compl. ¶ 169.   Even with these issues and the inability to recover payments due from QuantX, Liquid released information on October 30, 2014, stating that it had 129 customers, with 95 of them contributing to GAAP revenue and 34 under contract and expected to contribute to further revenue. Compl. ¶ 172.

Upon arriving, Kent investigated the issues confronting the Company as his first matter of business.  Kent quickly discovered that Liquid's relationship with QuantX was the Company's primary problem and that Kent and Storms needed to discuss Q-3 earning changes, public disclosures and a delay in its 10-Q filing. Compl. ¶¶ 193-97.  Staying true to his word, Kent added a warning about Liquid's reliance on QuantX in Liquid's publicly filed 10-Q for the period ending September 30, 2014 (the "Q-3 Earnings Statement"), stating publicly for the first time that there could be no assurance in the future that QuantX would make its payments to Liquid in a timely fashion. Compl. ¶ 197.

With no change in behavior, Liquid served QuantX with a demand letter on December 23, 2014, which: (i) required QuantX to pay $1.7 million in back payments for services rendered; (ii) stated that services would be suspended; (iii) demanded payment on a term note due from QuantX; (iv) demanded payment on a term note due from Ferdinand Capital; and (v) terminated Ferdinand's Consulting Agreement. Compl. ¶ 203. Simultaneously with the demand letter, Liquid filed an 8-K current report with the SEC announcing suspension of services to QuantX, and disclosed that QuantX and managers to whom QuantX allocated investment capital accounted for 95% of Liquid's software revenue. Compl. ¶ 204.

On top of the QuantX issues, Von Allmen came to Liquid in February 2015 and discussed alleged misrepresentations that had been made to him during the history of the Company. Compl. ¶ 206-08.  Spurred by Von Allmen's allegations, Zavarro and Liquid's lawyers formed an audit committee (the "Audit Committee") to conduct an

internal investigation.[10] Compl. ¶ 208.  The Audit Committee presented an investigative report in May 2015 to Grant Thornton, at which point Grant Thornton requested the Audit Committee to engage an independent law firm to conduct a separate investigation. Compl. ¶ 216.  Shortly thereafter, on May 28, 2015, Liquid issued a "Business Update" which disclosed updated customer data for the periods ending December 31, 2014, and March 31, 2015. Compl. ¶ 217.  This report stated that with the suspension of QuantX, as of December 31, 2014, Liquid had only 7 customers contributing to revenue using only 18 Units; and as of March 31, 2015, Liquid only had 11 customers using 46 Units. *Id.*

Liquid's Demise

Following the May 28 report, Liquid began to unravel.  On August 17, 2015, Liquid notified the SEC that it was unable to file a quarterly report for the period ending June 30, 2015, due to the Audit Committee's ongoing investigation. Compl. ¶ 221.  On September 8, 2015, Storms resigned from the board. Compl. ¶ 222.  On September 10, 2015, the Audit Committee and the Board determined that the Q-3 Earnings Statement required restatement due to accounting errors involving premature recognition of revenue from QuantX and other customers before collectability was reasonably assured. Compl. ¶ 223.  On September 24, 2015, the Audit Committee released its findings from its investigation, stating: (i) evidence showed Ferdinand and Keller had entered into the Pre-IPO Deal to give stock to Von Allmen for no consideration and without disclosure;

---

[10] Zavarro eventually resigned from the Board and Audit Committee on February 20, 2015, and on March 1, 2015, Liquid removed Storms from his role as CEO and replaced him with Kent. Compl. ¶¶ 210-214.

(ii) what had been disclosed as a stock sale by Keller to Storms was actually a loan; (iii) Storms had borrowed significant sums of money from Ferdinand, Von Allmen and Suskind's own bank; and (iv) the previously issued Q-3 Earnings Statement contained errors and could not be relied upon. Compl. ¶ 225.  On October 28, 2015, Liquid's stock was de-listed from NASDAQ. Compl. ¶ 226.

<u>Individual Financial Issues</u>

Intertwined with the failure of Liquid, Ferdinand and Storms both endured their own personal financial problems during the lifetime of the Company.  The pair had each invested heavily in Liquid from the outset, but as Liquid yielded less and less profit, Ferdinand and Storms were left with mounting personal debt they could not repay.

In May 2013, Storms borrowed $5 million from a Keller entity, using the money to purchase Liquid stock. Compl. ¶ 174.  On Liquid's S-1 Registration Statement, the transaction was characterized as a stock sale. *Id.*  Storms additionally borrowed $1.1 million from Ferdinand to pay certain taxes he owed, and personally borrowed $200,000 from Von Allmen to purchase more stock. Compl. ¶¶ 175-76.  In the fall of 2014, when Storms' personal loans came due, Liquid was not producing enough of a profit for repayment to Ferdinand, Keller or Von Allmen.  To attempt to lower his debts, Storms spoke with Keller, who agreed to restructure the note between the two and reduce the balance from $5 million to $1.25 million in exchange for an immediate lump sum payment from Storms. *See* Compl. ¶ 179-80.  Struggling for cash, Storms was forced to again borrow.  On October 12, 2104, Storms reached out to Von Allmen requesting an additional $1.1 million loan, which he used to repay Ferdinand the money owed from the March

2014 loan. Compl ¶ 182.  Storms then received a $2 million loan from Bridgehampton National Bank which he used to repay the October 2014 loan from Von Allmen. Compl. ¶¶ 183-84.

Ferdinand also faced personal financial difficulties after his resignation from Liquid.  In July 2014, UBS Financial Services Inc. ("UBS") sued Ferdinand for approximately $2.3 million he owed on a line of credit. Compl. ¶ 185.  Ferdinand and UBS settled in September 2014, with Ferdinand agreeing to repay the $2.3 million in full in five installments. Compl. ¶ 186.  Ferdinand's financial issues with UBS also put a financial strain on Liquid.  To meet his settlement requirements, Ferdinand requested on several occasions that Liquid release shares of Liquid stock frozen under the Lock-Up Agreement. Compl. ¶¶ 188-191.  Ferdinand combined the Liquid shares with the $1.1 million he received from Storms to satisfy his obligations under the UBS settlement agreement. Compl. ¶ 192.

With Liquid, as well as its officers and directors, suffering financial trouble, the Company filed for bankruptcy on January 27, 2016, under chapter 11 of the Bankruptcy Code.[11] Compl. ¶ 227.  Liquid thereafter converted its case to a chapter 7 liquidation on February 25, 2016.[12] Compl. ¶ 227; D.I. 56.

---

[11] *See In re Liquid Holdings Group, Inc.,* No. 16-10202 (KG) D.I. 1 (Bankr. D. Del. Jan 7, 2016).

[12] *See Liquid,* No. 16-10202 (KG) D.I. 56.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b).

## Legal Standard

Federal Rule of Civil Procedure 12(b)(6), made applicable by Bankruptcy Rule 7012(b), provides for dismissal if a complaint fails to state a claim upon which relief can be granted.  Rule 12(b)(6) is associated with Federal Rule of Civil Procedure 8(a)(2), made applicable by Bankruptcy Rule 7008, which states that a complaint fails unless it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 285 (1986)).  The *Twombly* standard is one of plausibility and not probability "[and] simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556.  In analyzing a complaint, the court will determine if a plaintiff has "nudged [their] claims across the line from conceivable to plausible." *Id.* at 570.

The Supreme Court further addressed the Rule 8(a)(2) pleading standard in its *Iqbal* decision.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009).  Under *Iqbal*, the Supreme

12

Court affirmed that the *Twombly* standard applies to all civil suits in federal courts and further identified that "a court must accept as true all of the allegations contained in the complaint," and "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678.  The Third Circuit in applying the *Iqbal* standard stated a two-part test:

> First, the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a [court] must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d. Cir. 2009).  With these principles in mind, the Court will proceed with its analysis of the Motion.

## Discussion

Considering the Trustee asserts accusations against several different Defendants, the Court will conduct its analysis on a count-by-count basis.

### I.    Count One – Common Law Fraud

Under Delaware law, a plaintiff seeking to state a claim for common law fraud must plead facts supporting an inference that: (1) the defendants made a false representation or omission; (2) the defendants knew or believed that representation was false or made with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the defendants misrepresentation or omission; and (5) the plaintiff was

injured by its reliance on the defendants misrepresentation or omission.[13] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del. Ch. 2006), *aff'd sub nom., Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).  Fed. R. Civ. P. Rule 9(b) requires the moving party to state with particularity the circumstances constituting fraud, excluding malice, intent or knowledge, which may be averred generally.[14] *See Industrial Enterprises of America, Inc. v. Mazzuto* (*In re Pitt Penn Holding Co.*) (*Pitt Penn II*), 484 B.R. 25, 36 (Bankr. D. Del. 2012).

The Trustee alleges that the Officer Defendants engaged in wrongdoing with the intent to defraud and deceive Liquid and its creditors.  Specifically, the Trustee alleges that Defendants engaged in the following conduct:

1. Falsely represented that Liquid developed and possessed fully functional cutting edge software;

2. Took Liquid public at a valuation that had no basis in fact (the Acquisition Spree and IPO);

3. Facilitated the recording of phony customers;

4. Facilitated the booking of phony and inflated revenues derived from customers that were not paying Liquid for its services; and

5. Facilitated the accounting misrepresentations to carry out the allegations set forth in the Complaint.[15]

---

[13] Neither the Trustee nor the Officer Defendants specify whether Delaware or New York law applies in analyzing the Trustee's common law claims.  As the New York standard for common law fraud is substantially similar to Delaware's standard, *see RBE N. Funding, Inc. v. Stone Mtn. Holdings, LLC*, 78 A.D.3d 807, 809 (N.Y. App. Div. 2010), the Court will use Delaware law in its analysis.

[14] Fed. R. Civ. P. Rule 9(b) is made applicable by Fed. R. Bankr. P. Rule 7009.

[15] For any fraud allegations that survive the Motions, the Court finds there are facts supporting any accounting misrepresentations in the Complaint.

Before addressing each of the Officer Defendants individually, the Court can generally rule on the Trustee's allegations that the Officer Defendants facilitated the recording of phony customers. The Court has scoured the Complaint and found no names of fictional customers or statements made to Liquid regarding fictional customers. Even viewing the facts in a light most favorable to the Trustee, the Complaint is devoid of any statements supporting an allegation that the Officer Defendants falsely represented to Liquid the recording of such customers.

### A. Ferdinand

#### 1. Inflated Valuation

Referencing the inflated valuation, the Court sees the Trustee presenting two separate arguments. The first is that Ferdinand defrauded the company by acquiring companies without receiving value in return and as a result took Liquid public at a value far above its real worth. The second is that by engaging in the Pre-IPO Deal with Von Allmen, Ferdinand deceived Liquid into believing it would receive more than it actually gained from the IPO.

#### a. Acquisition Spree and IPO

The Trustee alleges that Ferdinand defrauded Liquid by taking Liquid public at a value that had no basis in fact. Ferdinand perpetrated the over inflated value, the Trustee argues, by not obtaining reasonably equivalent value for the entities acquired in the Acquisition Spree and premising the IPO largely on inflated insider sales. From the facts presented in the Complaint, the Court finds insufficient allegations surrounding the Acquisition Spree and IPO to base a common law fraud claim.

15

A large portion of the Complaint outlines in detail the entities obtained during the Acquisition Spree, what Liquid gave as consideration for those entities, what it received in return and the deficiencies prevalent in those acquisitions.  The Trustee then alleges that certain discussions between Ferdinand and Von Allmen took place prior to the IPO regarding a discount on shares purchased.  Lastly, the Complaint details how the value Liquid expected to receive versus the value it actually received was due in large part to Ferdinand's pre-IPO dealings.  Missing, however, is any indication that Ferdinand fraudulently concealed or misrepresented any facts relating to the Acquisition Spree.  The Trustee points the Court to paragraph 125 of the Complaint which mentions Liquid's "crazy valuation relative to any real multiple of revenue." Tr. Br. Pg. 13, D.I. 95; Compl. ¶ 125.  The statement does not indicate how Ferdinand deceived Liquid regarding the details of the Acquisition Spree.  The Trustee alleges that Liquid received less than equivalent value for the entities obtained, but does not allege that Ferdinand hid or misrepresented the value received.  Therefore, concerning the Acquisition Spree and the IPO, the Trustee has not alleged common law fraud.

### b.  Pre-IPO Deal with Von Allmen

The Trustee also alleges that through the Pre-IPO Deal, Ferdinand deceived Liquid by intentionally omitting that Von Allmen agreed to receive a substantial amount of shares for no consideration.  For this claim, the Trustee has alleged fraudulent conduct.

The Complaint clearly lays out the Pre-IPO Deal that Ferdinand and Von Allmen entered into, the fraudulent representation by Ferdinand not to disclose the deal to Liquid, Liquid's reliance on Ferdinand's valuation which he based on the knowledge that

Von Allmen would purchase shares and the effect the Pre-IPO deal had on Liquid's price per share.   Moreover, the Audit Committee found evidence that Ferdinand did not disclose the Pre-IPO Deal to Liquid prior to the IPO.   Assuming these facts as true, the Trustee has met his burden of pleading fraud surrounding the Pre-IPO Deal.

Defendants argue that under the principles of agency law, any wrongdoing of an agent, and notice of such wrong doing, is imputed to the principal. *See Buchanan v. Reliance Ins. Co.* (*In re Color Tile, Inc.*), 475 F.3d 508, 513 (3d Cir. 2007) (citing *Am. Sur. Co. v. Pauly*, 170 U.S. 133, 153 (1898)).   Therefore, any knowledge of the Officer Defendants regarding their wrongdoing became imputed to Liquid. *Id.*   The Officer Defendants' imputation argument is one closely related to *in pari delicto*, a doctrine which courts hold does not apply to insiders. *Pitt Penn II*, 484 B.R. at 39 ("*[I]n pari delicto* does not apply where a plaintiff adequately alleges a defendant's insider status.").   As the Officer Defendants are statutorily "insiders," the imputation argument cannot prevail. *See* 11 U.S.C. § 101(31)(B)(ii).

### 2.   Software Misrepresentations

The Trustee also alleges that Ferdinand engaged in fraudulent conduct by representing that Liquid had cutting edge software which was not in fact cutting edge or functional.   The Trustee bases this claim primarily upon the Ryan Suit filed in New York prior to the IPO.[16]   In that suit, the plaintiffs accused Liquid of requiring them to purchase

---

[16] While the New York court ultimately dismissed the Ryan Suit, the Court does not give any weight or deference to the New York court's decision in it is analysis of the Trustee's allegations.

software that was incapable of performing the functions Liquid and Ferdinand promised, and that the software in fact did not work at all. The Ryan Suit is the only information provided by the Trustee referencing the functionality of the software. Even assuming the facts in the Complaint as true, the Trustee does not provide sufficient information to satisfy the heightened pleading standard of Rule 9(b).

In the very paragraph the Trustee cites as the basis for his software claim, the Complaint states "Liquid required [Ryan and Lugano] to purchase software that was incapable of performing the functions represented by *Liquid* and Ferdinand, and in fact did not work at all." Compl. ¶ 110 (emphasis added). To properly allege fraud in this case, the Trustee must set forth facts showing Ferdinand deceived Liquid, not the plaintiffs in the Ryan Suit. Liquid cannot claim to have been fraudulently deceived if it was also the party making the misrepresentations outlined in the Complaint. With the absence of any other facts mentioning Liquid's software functionality, the Court must dismiss the Trustee's software misrepresentation claim.

### 3. Inflated Revenues

Lastly, the Trustee alleges that Ferdinand facilitated the booking of phony revenue from customers that were not paying Liquid for its services. As the Court sees it, this allegation revolves entirely around QuantX and Liquid's failure to disclose that (1) Liquid heavily relied on QuantX's business, and (2) QuantX began to fall behind on its payments. The Trustee has adequately pled such claims.

The Trustee details in several paragraphs that Ferdinand knew of QuantX's inability to satisfy receivables as they came due before he left the Company. *See* Compl.

¶¶ 132, 136-38, 140-41.  In April 2014, Ferdinand was aware of QuantX's failure to pay, but any statement regarding this information allegedly failed to appear in Liquid's SEC filings.[17]  Based upon its lack of knowledge of QuantX's financial struggles, Liquid proceeded to issue a Second IPO despite relying heavily on QuantX as its primary customer.  The Trustee claims that these actions were carried out in large part due to Ferdinand's failure to disclose the financial pressures facing QuantX.  Accepting these allegations as true, the Trustee has properly alleged fraudulent conduct against Ferdinand.

Ferdinand argues that the Trustee bases much of his argument on the findings of the Audit Committee, which Liquid released in September 2015.  In September of 2015, the Audit Committee commented that only the Q-3 Earnings Statement needed to be restated. At the time when the Audit Committee released its findings, as well as the entire third quarter of 2104, Liquid no longer employed Ferdinand.  As a result, Ferdinand argues he cannot be liable for fraudulent omissions or misstatements made when he was not a part of the Company.

While Ferdinand is correct in stating he was not employed by Liquid during the Audit Committee's investigation or during the third quarter of 2014, the omissions and misrepresentations alleged are not solely limited to the Q-3 Earnings Statement.  The Trustee specifically states in the Complaint that "Liquid's top officials including

---

[17] Liquid filed a S-1 Registration Statement with the SEC proposing the Second IPO on April 9, 2014.  In this filing, Liquid disclosed the number of Units QuantX accounted for but did not disclose or emphasize Liquid's reliance on *QuantX's successes* according to the Complaint.

[Ferdinand] and [Shifrin] were aware no later than February 2014 that QuantX, by far the Company's largest revenue source, was late in making payments to Liquid." Compl. ¶ 132. The Q-3 Earnings Statement was not the only SEC filing issued after the Trustee alleges the Officer Defendants became aware of the QuantX issues. Liquid filed the S-1 Registration Statement in preparation for the Second IPO on April 5, 2014 (thirteen days before Ferdinand resigned) but failed to include the QuantX reliance and receivables issues. Thus, under the Trustee's theory of the case, the S-1 Registration Statement would constitute a fraudulent misrepresentation made by Ferdinand.

Ferdinand further argues that as a founder and investor, he provided substantial investments into Liquid and tied his success to the Company's. Based upon his investments, Ferdinand counters that he could not have the requisite scienter required to deceive the Company. *See, e.g., City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011). In *Roseville*, the District Court analyzed whether the plaintiff pled adequate facts to support its claim that certain officers and directors fraudulently concealed a price-fixing conspiracy. *Id.* In ruling on the plaintiffs failure to plead intent on behalf of the defendants, the District Court stated that "[t]he mere fact that defendants had access to stock options and were compensated according to the performance of their company, both of which are ubiquitous in corporate America, can hardly form the bases for a strong inference of scienter." *Id.* (citing *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). This case is inapposite to the Trustee's claim.

20

The *Roseville* case dealt with allegations under the Private Securities Litigation Reform Act (PSLRA) which replaces the Federal Rules as the pleading standard governing private securities class actions. *See id.*; 15 U.S.C. §§ 78u-4 *et seq.* While the PSLRA generally mirrors Rule 9(b), it differs in that the PSLRA requires scienter to be pled with specificity, while Rule 9(b) allows it to be pled generally. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F. 3d 242, 253 (3d Cir. 2009) (explaining that while the PLSRA largely echoes Rule 9(b), it requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," a "sharp break with Rule 9(b)" in regard to scienter). Consequently, the Trustee need only general averments concerning intent, which he satisfies by stating that Ferdinand intended to defraud and deceive the Company for his own pecuniary benefit.

### B. Storms and Shifrin

#### 1. Inflated Valuation[18]

As stated above, the Trustee has not alleged fraudulent conduct relating to the Acquisition Spree or the IPO. Seeing as the Trustee does not mention in any further detail

---

[18] In his brief, the Trustee alleges that Storms is liable for fraudulent conduct regarding his loan/stock sale from a Keller entity, which he used to purchase Liquid stock. The allegations in the Complaint, however, do not appear to lay the foundation for bringing such a claim in Count One. Absent the Trustee's argument in his brief, the Court could not, on its own, have gleaned that Storms' loan/stock sale was at issue in the case and any claims addressing such are dismissed.

Storms' or Shifrin's involvement, and as neither were involved in the Pre-IPO Deal, no fraud claim relating to inflated valuation can survive the Motion.[19]

### 2.  Software Misrepresentations

The Trustee bases the entire software misrepresentation on the Ryan Suit and the allegations therein.  The Ryan Suit only mentions Ferdinand individually, neither Storms nor Shifrin are implicated in the pleadings as delineated in the Complaint.  In addition to referencing the time, place and contents of any fraudulent representations, Rule 9(b) requires the Trustee to also identify the person making such representations. *See In re Lyn*, 483 B.R. 440, 452 (Bankr. D. Del. 2012).  Since there are no facts alleged of Storms or Shifrin making any statement regarding the software, let alone a misleading one, the Trustee fails to allege a claim against the two individuals.

### 3.  Inflated Revenues

The Trustee may allege the inflation QuantX revenue through fraudulent misrepresentations if he points the Court to each specific individual's furtive behavior.  To begin, the Court notes that Storms and Shifrin were officers of Liquid largely at the same time as Ferdinand.  In most of the factual allegations which implicate Ferdinand having knowledge of the QuantX issues, the Trustee also includes Storms and/or Shifrin.  Therefore, the Court incorporates its analysis regarding Ferdinand and the QuantX

---

[19] The Court also notes that Storms did not become an officer of Liquid until December 2013.  This makes it impossible for him to be liable for any actions surrounding the Acquisition Spree or IPO because he did not work for the Company at the time.

misrepresentations prior to the Q-3 Earnings Statement to Storms and Shifrin and finds the Trustee has adequately pled facts alleging such fraud.

Additionally, unlike Ferdinand both Storms and Shifrin worked for Liquid when it released the Q-3 Earnings Statement.  In the Complaint, the Trustee lays out several factual situations in which Storms and Shifrin state that they were aware of the QuantX reliance and inability to pay prior to November 2014 (when Liquid made the Q-3 Earnings Statement). *See* Compl. ¶¶ 132, 137, 140-41, 148, 151, 168, 172.  Moreover, the Audit Committee found the Q-3 Earnings Statement contained errors regarding premature recognition of QuantX revenue, the very errors of which the Trustee alleges Storms and Shifrin were aware.  Considering Storms and Shifrin maintained their positions beyond September 2014, the Court finds that the Complaint adequately alleges fraud by Storms and Shifrin concerning the Q-3 Earnings Statement.  For these reasons, the Court grants in part and denies in part the Motions to dismiss Count One.

## II.    Count Two – Breach of Fiduciary Duty (Officer Defendants)

Courts have long recognized that "directors and officers of a Delaware corporation owe fiduciary duties to the corporation and its shareholders." *See, e.g. Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).  Specifically, the officers and directors owe the corporation and its shareholders the duties of care and loyalty. *Revlon, Inc. v. Mac Andrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986); 8 Del. C. § 141(a).

A plaintiff can only prove a breach of the duty of care by showing the defendants acted with gross negligence or with a "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."

*Benihana of Tokyo v. Benihana*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 144 (Del. 2006).  Behavior constituting gross negligence certainly depends on the situation, but it generally requires that directors and officers deliberately fail to inform themselves. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993) ("Applying the rule, a trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner….").

The duty of loyalty, on the other hand, "mandates that the best interest of the corporation and its shareholders take [] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (citing *Cede*, 634 A.2d at 360).  "A breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain." *Official Comm. of Unsecured Creditors v. Bay Harbor Master Ltd.* (*In re BH S & B Holdings LLC*), 420 B.R. 112, 150 (Bankr. S.D.N.Y. 2009) (citing *Joseph v. Frank (In re Troll Commc'ns)*, 385 B.R. 110, 118 (Bankr. D. Del. 2008)).  Further, "the duty of good faith is a 'subsidiary element' of the 'fundamental duty of loyalty.'" *Burtch v. Huston* (*In re USDigital*), 443 B.R. 22, 41 (Bankr. D. Del. 2011) (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del. Ch. 2003)). A breach of the duty of good faith may be demonstrated by showing the defendant (i) "intentionally [acting] with a purpose other than that of advancing the best interest of the corporation," (ii) "acting with the intent to violate applicable positive law," or (iii) "intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for his

duties."[20] *Disney*, 906 A.2d at 67.    The Trustee alleges that the Officer Defendants breached their fiduciary duties by engaging in self-dealing, abusing their positions of control to favor their own interests and managing Liquid in an unfair and inequitable manner.

The Trustee's duty of care allegations revolve around Liquid's dependence upon QuantX and its obligation to release shares based upon Ferdinand's settlement payments to UBS.[21]    From the information provided in the Complaint, these allegations are insufficient to sustain the Trustee's claims.

The general allegation that the Officer Defendants made Liquid dependent upon QuantX is not enough to plead grossly negligent conduct.    The Trustee merely states a fact that is apparent in hindsight of Liquid's financial collapse.    The Complaint lacks any alleged facts that the Officer Defendants, for example, failed to field calls from potential clients, actively ignored any material information reasonably available to them or failed to exercise even a slight degree of care. *See In re AgFeed USA, LLC (AgFeed I)*, 546 B.R. 318, 329 (Bankr. D. Del. 2016) (finding that only alleging the defendant should have known that fraud was taking place or should have done more to realize fraud occurred was

---

[20] The *Disney* court noted that while this list may be a guide for courts determining a breach of good faith, it is not meant to be exhaustive and "[t]here may be other examples of bad faith yet to be proven or alleged, but these three are the most salient." *Disney*, 906 A.2d at 67.

[21] In his brief, the Trustee mentions several other factual scenarios that he believes constitute a breach of the duty of care, such as certifying false and misleading financial information, defrauding Von Allmen and basing Liquid's valuation on inflated sales during the Acquisition Spree.  The Court finds these specific scenarios to fall under the duty of good faith requirements, making them a duty of loyalty issue only.

insubstantial to prove gross negligence).[22]  While the Complaint does not need to allege with specificity the duty of care violations against the Officer Defendants, it does need to set forth *some* well-pled facts supporting an inference of gross negligence.  Such facts do not appear in the Trustee's allegations.

Even though a plaintiff may plead fiduciary duty claims generally, if the allegations are grounded in fraud the standard shifts and the plaintiff must plead any claims with specificity. *See Pitt Penn II*, 484 B.R. at 53 (noting that a party alleging a breach of fiduciary duty claims based upon fraudulent conduct is subject to the heightened pleading standard of Rule 9(b)).  As discussed more thoroughly in the Court's Count Four/Five analysis below,[23] the Trustee has not alleged with specificity any fraudulent conduct relating to the Acquisition Spree due to the benefit Liquid received from the IPO, and therefore the duty of loyalty claims surrounding the Acquisition Spree also cannot survive the motion to dismiss.  The actions surrounding the Pre-IPO Deal, however, can survive for Ferdinand only.[24]

The Trustee has properly alleged fraudulent conduct relating to the QuantX reliance misrepresentations.  While these allegations do not fall under the standard duty

---

[22] The *AgFeed I* Court applied Nevada law in its analysis; however, Nevada's corporate law largely mirrors Delaware's corporate law, and when Nevada looks for clarification in its own laws it often looks to Delaware courts for guidance. *See Hilton Hotels Corp. v. ITT Corp.*, 978 F. Supp. 1342, 1346 (D. Nev. 1997).

[23] *See* Section IV "Count Four/Five – Aiding and Abetting Breach of Fiduciary Duty/Aiding and Abetting Fraud."

[24] While Shifrin was at Liquid during the Pre-IPO Deal, the Trustee does not allege he played a part in, or had knowledge of, the Pre-IPO Deal.

of loyalty claim because they are not alleging a self-interested transaction, they do substantiate a claim under the duty of good faith. *See Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1217 (Del. 2012) (concluding that a failure to inform and a slew of willful misrepresentations supported the lower court's determination that the defendant breached his duty of good faith); *Guttman*, 823 A.2d at 506 n. 34 ("A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest."). Therefore, the Court finds the Trustee's fiduciary duty claims relating to the QuantX and financial filing misrepresentations sufficient.[25]

Ferdinand argues that in the event the Trustee does present facts that substantiate a fiduciary duty claim, the Officer Directors are protected from those claims by Liquid's exculpation clause in the LLC Agreement.   At the motion to dismiss stage, "[a]n exculpatory clause is considered an affirmative defense and will not provide the basis for dismissal." *Stanziale v. Versa Capital Mgmt., LLC* (*In re Simplexity, LLC*), 2017 WL 65069, at *6 (Bankr. D. Del. Jan. 5, 2017).  In cases where a court may consider an exculpatory clause, the exculpation provision analysis is limited to violations of the duty of care. *Id.* (citing *Official Comm. of Unsecured Creditors v. Nat'l Amusements Inc.* (*In re Midway Games, Inc.*), 428 B.R. 303, 317 (Bankr. D. Del. 2010)).   As the remaining Pre-IPO claims against

---

[25] The Officer Defendants additionally argue that they could find refuge in the business judgment rule.  Based upon the facts presented, the Court will not judge the Complaint on the basis of the business judgment rule at this stage in the proceedings. *See Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 556-57 (D. Del. 2008) (concluding that the business judgment rule did not implicitly appear on the face of the complaint and therefore the rule was not considered on a motion to dismiss).

Ferdinand encompass the duty of loyalty, the LLC Agreement exculpation provision cannot be used at this stage.[26]

Defendants further argue that per Delaware law, the fiduciary duty claims are time-barred because they were not brought within three years from the accrual of the cause of action (in this case the Acquisition Spree, the Pre-IPO Deal and the QuantX misrepresentations). 10 Del. C. § 8106.  Generally the statute of limitations runs on accrual, but "a defendant's 'fraudulent concealment' may toll the running of the statute of limitations until a plaintiff's 'rights are discovered or could have been discovered by the exercise of reasonable diligence.'" *Smith v. Whelan*, 566 Fed. Appx. 177, 179 (3d Cir. 2014) (quoting *Giordano v. Czerwinski*, 216 A.2d 874, 876 (Del. 1966)).  The remaining fiduciary allegations by the Trustee consist of the Pre-IPO Deal and the QuantX misrepresentations.  Through its investigation, the Audit Committee discovered issues surrounding both the Pre-IPO Deal and the QuantX misrepresentations.  Prior to the Audit Committee's findings, there are no indications in the Complaint that Liquid had knowledge of these issues.  As the Audit Committee (and by representation, Liquid) did

---

[26] To the extent that the Officer Defendants sought to invoke the LLC Agreement for any duty of care violations relating to the QuantX issues, the Court is not prepared to address those arguments at this stage in the proceeding.  Liquid formed initially as a limited liability company in January 2012, but converted to a corporation in connection with the IPO in July 2013.  QuantX, on the other hand, became a customer in April 2012.  Therefore, the Officer Defendants' actions regarding QuantX may have occurred only when Liquid was Liquid Holdings Group, LLC, only when Liquid was Liquid Holdings Group, Inc., or a combination of both.  The implications of the LLC Agreement and any exculpatory provisions therein depends heavily on when the violations may have occurred.  At this stage, the Court must analyze the unknown in the light most favorable to the Trustee, denying the Officer Defendants' argument at this stage in the proceeding but allowing for further factual information to come to light later in the case.

not discover the alleged fraudulent conduct until September 2015, the Court finds for the purposes of the Motions that the statute of limitations did not begin to run until September 2015, resulting in a timely motion by the Trustee.  For these reasons, the Court grants in part and denies in part the Motions seeking to dismiss Count Two.

## III.    Count Three – Breach of Fiduciary Duty (Director Defendants)

While officers hold fiduciary duties to run and operate their companies, "[t]he ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986); 8 Del. C. § 141(a).  In addition to the Officer Defendants' claims, the Trustee raises allegations against the Director Defendants for violations of their fiduciary duties. Although the Complaint addresses the fiduciary duty allegations generally, the Court divides the Director Defendants into two camps, Schaeffer being the first and the remainder of the Director Defendants (the "Bernstein Group") being the second.[27]

### A.  Schaeffer

The Trustee alleges that Schaeffer played a central role in the founding of Liquid and was a driving force in the effort to prematurely take Liquid public at a grossly inflated valuation.  Considering Schaeffer left the Board in July 2013, his liability is limited

---

[27] Schaeffer is unique among the Director Defendants because in addition to being on the Board, he founded the company.  Furthermore, Schaeffer only remained on the Board until July 26, 2013.  This makes Schaeffer subject to any claims surrounding the Acquisition Spree and IPO, but not subject to any claims regarding the QuantX issues.  The Bernstein Group, which consists of Bernstein, Zavarro, Davy, Ross, Francescani, Raquet, Simone and Suskind, all joined the group after the Acquisition Spree, and generally remained on the Board during the QuantX issues.

to allegations surrounding only the Acquisition Spree and the IPO.  As the Court has already determined that the Trustee failed to plead any fiduciary breaches surrounding the Acquisition Spree and the IPO, and furthermore noting that the Complaint scantily describes Schaeffer's involvement in Liquid, the Court finds the Complaint does not contain sufficient breach of fiduciary duty allegations against Schaeffer to withstand dismissal.

### B.  The Bernstein Group

As a subset of the duty of loyalty, Delaware law recognizes that directors have a duty to exercise oversight of their respective entities. *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *Stone v. Ritter*, 911 A.2d 362, 370-71 (Del. 2006) (finding that director oversight liability conduct is governed by the duty of loyalty).  To plead a *Caremark* claim, a plaintiff must show "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370 (emphasis in original).  In demonstrating either of the above conditions, it is not enough for a plaintiff to show even gross negligence. *Id.*  Only "a showing that the directors *knew* that they were not discharging their fiduciary obligations" will substantiate a *Caremark* claim. *Id.* (citing *Guttman*, 823 A.2d at 506 n. 34) (emphasis added).

The majority of the Trustee's claims against the Bernstein Group revolve around the Board's alleged inability to establish, monitor and maintain adequate control and

reporting systems.  By failing to monitor the actions of the Officer Defendants, the Trustee claims that the Bernstein Group facilitated the frauds and other wrongs carried out by Ferdinand, Storms and Shifrin.  In this case, the Trustee has not adequately plead a *Caremark* claim.

Under the first prong of *Caremark*, the Court is required to analyze the information system or controls that the Board implemented. *See Guttman*, 823 A.2d at 507.  This requires the Trustee to provide the Court with the typical protocol Liquid demanded so that an analysis of the Board's shortfalls can be analyzed. *Id.*  Despite this requirement, the Complaint is devoid of any information regarding Liquid's reporting systems, compliance requirements or information controls.  Consequently, the Court cannot tell if the Bernstein Group followed any of the required steps because the Court is not aware of what those steps were in the first place.

In support of his argument, the Trustee argues that the Bernstein Group was willfully blind and intentionally ignorant by pointing to the fact that the Acquisition Spree and the QuantX issues were detailed at length in the Complaint.[28]  This argument

---

[28] The Trustee also mentions that the findings of the Audit Committee, which began its investigation in February 2015, demonstrate that the Board had the capability and resources to discover the wrongdoings of the Officer Defendants. The Trustee then argues that this demonstrates that prior to February 2015, the Board could have discovered the fraud but failed to do so because it did not implement the required controls.  The problem with the Trustee's argument is, again, that the Trustee has not provided the Court with any facts in the Complaint demonstrating when the Board should have informed the Audit Committee to investigate.  The Complaint does not provide any information that indicates that by February 2015 it was too late to discover any wrongdoing.  In fact, the Complaint mentions that Von Allmen's letter accusing Liquid of misrepresentation led the Audit Committee to investigate.  According to the Complaint, this is the first mention of the Bernstein Group becoming aware of any fraudulent conduct.  The Complaint thus suggests that the first instance in which the Bernstein Group learned of any

does not resolve the fact that while the Trustee may have detailed at length the Acquisition Spree and QuantX issues, the Complaint does not reveal the controls or requirements the Board was required to implement, and does not adequately allege that the controls or requirements were not implemented.

To prove a claim under the second prong, *Caremark* requires the Trustee to plead facts suggesting the Board consciously failed to monitor or oversee Liquid's operations, which the Trustee could show by alleging that the Board observed certain "red flags" but knowingly disregarded them such that they completely disabled themselves from being informed of risks or problems. *Stone*, 911 A.2d at 370. "Under Delaware law, red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer." *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008).

As with the first prong, the Complaint lacks facts showing that the Bernstein Group became aware of any "red flags" during their tenure as Board members. The Trustee counters by stating that the Director Defendants failure to apprise themselves of information relating to Liquid's assets (such as the companies procured in the Acquisition Spree) or information relating to Liquid's reliance on QuantX constitutes a failure to adequately monitor corporate performance. Lacking from this statement is any factual foundation supporting the Trustee's argument. There are no "red flags" alleged that would have compelled the Board to investigate the assets acquired in the Acquisition Spree or the QuantX issues prior to the Audit Committee investigation in February 2015.

---

misconduct was in 2015; and upon learning of such misconduct, the Directors satisfied their fiduciary duties by immediately taking action.

The Trustee's comments are wholly conclusory in nature and merely allege that because the Officer Defendants engaged in allegedly fraudulent conduct, the Board should have been aware.[29] *See JLL Consultants, Inc. v. Gothner* (*In re AgFeed USA, LLC*) (*AgFeed II*), 558 B.R. 116, 126 (Bankr. D. Del. 2016) ("It is insufficient to make conclusory allegations that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.")

Turning to the claims not involving *Caremark*, the Complaint fails to allege a breach of either the duty of care or duty of loyalty.  To allege a breach of the duty of loyalty, the Trustee is required to plead at least an inference of a self-interested transaction.  Specific to the Bernstein Group, there is no such allegation in the Complaint.  To allege a breach of the duty of care, the Trustee is required to plead at least an inference of gross negligence.  The Trustee spends the majority of the Complaint (and ultimately a majority of his brief) detailing the Bernstein Group's failure of oversight and inability to act.  Beyond these *Caremark* claim facts, the Complaint contains no other allegations that rise to a level of gross negligence.

---

[29] In his brief, the Trustee mentions that the Board should have known about the fraudulent conduct because it "was not hidden below the surface." Tr. Br. Pg. 25, D.I. 95.  This statement carries little weight because it directly counters the Trustee's argument (which the Court has accepted) that the statute of limitations for both fiduciary duty claims and waste claims should not be time barred because "[the Officer Defendants'] conduct could not reasonably have been discovered by those it harmed such that suit could have been brought against them for breach of fiduciary duty until after the Debtor filed for bankruptcy in January 2016, or at least until Ballard Spahr issued its investigative findings in September 2015." *Id.* at pg. 28.  The Trustee cannot argue that on one hand the fraudulent conduct should have been known by the Board, but on the other hand could not have been known by the same Board.

Therefore, based upon his wholly conclusory statements, the Trustee has not pled the Bernstein Group violated any fiduciary duties.  For these reasons, the Court grants the Motions to dismiss Count Three.

## IV.    Count Four/Five – Aiding and Abetting Breach of Fiduciary Duty/Aiding and Abetting Fraud

To establish a claim for aiding and abetting breach of fiduciary duty under Delaware law, a plaintiff must establish "(1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and nonfiduciary." *Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P.* (*In re Fedders North America, Inc.*), 405 B.R. 527, 544 (Bankr. D. Del. 2009) (citing *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008)).  As with standard fiduciary duty claims, any general allegations are subject to the general pleading requirements of Rule 8(a) while any fraudulent allegations are subject to the heightened pleading requirements of Rule 9(a). *See End of the Road Trust v. Terex Corp.* (*In re Fruehauf Trailer Corp.*), 250 B.R. 168, 197-98 (Bankr. D. Del. 2000).

The Trustee alleges that as the underwriter of the IPO, Sandler provided substantial assistance to the Officer Defendants to facilitate, solicit and promote a public offering it knew had no basis in fact.  The Trustee cannot bring these claims against Sandler as it is barred under the *in pari delicto* doctrine.

To substantiate his fiduciary duty claim against Sandler, the Trustee must allege first that Sandler aided and abetted fraudulent conduct.[30]  In claims against alleged defrauding parties, the *in pari delicto* doctrine acts as an equitable defense analogous to unclean hands, that is the plaintiff should not recover when it benefitted from the wrong. *See OHC Liquidation Trust v. Credit Suisse First Boston* (*In re Oakwood Homes Corp.*), 389 B.R. 357, 365 (D. Del. 2008).  "This doctrine applies to a 'bankruptcy trustee, standing in the shoes of [the wrongdoing] debtor.'" *Id.* (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 354 (3d Cir. 2001)).

The adverse interest exception, however, allows a trustee to rebut the *in pari delicto* doctrine by demonstrating that the wrongdoer's actions were completely adverse to the debtor's (or in a corporate context, the corporation's) interest. *Pitt Penn II*, 484 B.R. at 39 (citing *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952-53 (N.Y. App. Div. 2010)).  But, the adverse interest exception only applies to circumstances in which the corporation receives little to no substantial benefit from any alleged wrongdoing. *Compare Barry v. Santander Bank, N.A.* (*In re Liberty State Benefits of Delaware, Inc.*), 541 B.R. 219, 235 (Bankr. D. Del. 2015) ("If a corporation receives any sort of benefit from the fraud, no matter how small that benefit might be, the trustee may not assert [the adverse interest exception] counter-defense."), *with Pitt Penn II*, 484 B.R. at 41-42 (noting that despite the defendants receiving some proceeds from the agent's fraudulent conduct, the corporation received

---

[30] The Trustee's fiduciary duty claims are based upon the Officer Defendants' violation of the duty of loyalty in connection with the IPO.  Under Rule 9(b), any duty of loyalty claims founded in fraud must be pled with specificity.

the benefits incidentally and they were ultimately used to perpetrate the fraud).   In analyzing if the wrongdoer's actions were in fact adverse to the corporation, "courts have identified '[t]he relevant issue [as being the] short term benefit or detriment to the corporation, not any detriment…resulting from the unmasking of the fraud.'" *Kirschner*, 938 N.E.2d at 947 (quoting *Wedtech Corp. v. KMG Main Hurdman* (*In re Wedtech Corp.*), 81 B.R. 240, 242 (S.D.N.Y. 1987)).

In the Complaint, the Trustee alleges that the Officer Defendants, with the help of Sandler, took Liquid public at a dollar amount that far exceeded its actual value in the market.  While Sandler objects to the Trustee's allegations, what both parties seemingly do not dispute is that Liquid received compensation for the IPO.  The Complaint states that through the IPO Liquid received $26.7 million, $14.6 million of which was made immediately available to Liquid. [31]   Thus, even if Sandler committed fraud in the IPO, Liquid received a substantial benefit, negating the adverse interest exception.

As the Trustee cannot rebut the *in pari delicto* doctrine, he cannot bring any fiduciary duty claims.  For these reasons, the court grants the Motions to dismiss Counts Four and Five.

## V.   Count Six – Avoidance of Transfers Under 6 Del. C. § 1304(a)(1) and 11 U.S.C. § 544

The Bankruptcy Code permits a trustee to avoid any transfer of property to unsecured creditors that is avoidable under applicable state law. *See* 11 U.S.C. § 544.

---

[31] The Complaint also alleges that Sandler assisted in promoting and sharing shares in the Second IPO.  The Court cannot accept this claim as the Complaint does not contain any statements that connect Sandler with the Second IPO.

Under Delaware law, a fraudulent transfer is avoidable if the debtor made the transfer "with actual intent to hinder, delay or defraud any creditor of the debtor." 6 Del. C. § 1304(a)(1). "Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent." *Fedders*, at 545 (citing *Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*), 327 B.R. 537, 550 (D. Del. 2005)). In determining actual intent, Delaware provides a list of "badges of fraud" which may be given consideration in a court's analysis, including:

> (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

6 Del. C. § 1304(b). "The presence of a single badge is not conclusive," and the proper inquiry is to analyze whether enough badges of fraud are present to cast suspicion on the transferors intent. *Fedders*, 405 B.R. at 545 (citing *Hill*, 342 B.R. at 198). Should the badges of fraud not be sufficient for a court's analysis, "[it] may consider other factors relevant to the transaction." *Hill*, 342 B.R. at 198-99. Under these badges, the Trustee pleads facts sufficient to allow Count Six to proceed.

The Trustee claims that the Acquisition Spree transactions (the "Transfers") were made to Liquid for little to no reasonably equivalent value, while it was insolvent and with the intent to hinder and/or delay Liquid's creditors. In support of his argument, the Trustee points to the badges of fraud listed in § 1304(b), specifically arguing that under § 1304(b)(1) the Transfers were made to the Founders and their respective entities as insiders, under § 1304(b)(3) Liquid retained possession of the Transfers and under § 1304(b)(8) Liquid did not receive reasonably equivalent value. The Complaint sufficiently outlines facts to support each badge of fraud, and analyzed together casts suspicion on the Founders and their entities' intent surrounding the Transfers.[32]

Defendants object to the assertion that the Transfers were made for less than reasonably equivalent value. The Third Circuit holds generally that a party receives reasonably equivalent value when it gets roughly the value it gave. *CFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007). "To plead lack of reasonably equivalent value exchanged sufficiently…the [t]rustee must present some information of the value of what [the debtor] received in exchange for the [t]ransfers." *Springel v. Craig (In re Innovative Commc'ns Corp.)*, 2013 WL 1795940, at *8 (Bankr. D.V.I. Apr. 29, 2013).

---

[32] Schaeffer argues that under Rule 9(b), the Trustee has not pled with specificity the intent to hinder, delay or defraud Liquid. Schaeffer misunderstands Rule 9(b) in connection with the badges of fraud required under 6 Del. C. § 1304, applicable through 11 U.S.C. § 544. The "Trustee does not need to plead the transferors' fraudulent intent with particularity; instead [the] Trustee can sufficiently plead fraudulent intent by alleging certain 'badges of fraud….'" *Zazzali v. Swenson (In re DSBI, Inc.)*, 2011 WL 1810632, at *3 (Bankr. D. Del. May 5, 2011); *see also Charys Liquidating Trust v. Growth Mgmt., LLC (In re Charys Holding Co., Inc.)*, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010) ("Badges of fraud have historically been used to show fraudulent intent, which may be pled generally under Rule 9(b).").

The Complaint, in detail, demonstrates the Transfers and the theoretical value Liquid received in return.[33]   Moreover, "[t]he Third Circuit utilizes a totality of the circumstances test in determining whether reasonably equivalent value was given, and that factual inquiry is not suitable for determination on a motion to dismiss." *Miller v. Greenwich Capital Fin. Products, Inc.* (*In re Am. Bus. Fin. Servs., Inc.*), 361 B.R. 747, 760 (Bankr. D. Del. 2007).  Despite courts in this Circuit dismissing claims for a failure to plead insolvency,[34] those rulings involved complaints that pled no information regarding value and simply restated the statutory language.  That is not the case here.

Defendants argue that the Trustee's badges of fraud are not sufficient because Liquid's stocks are not considered property of the debtor, and even if they were property, they had no value.  Concerning Defendants' first argument, this Court does permit stock to constitute property of the debtor. *See e.g., In re Pitt Penn Holding Co., Inc. (Pitt Penn I),* 2011 WL 4352373, at *5 (Bankr. D. Del. Sept. 16, 2011) (citing *United States v. Whiting Pools, Inc.*, 432 U.S. 198, 204 (1983)).

Even if the Court considers Liquid's stock as property of the debtor, Defendants counter that Liquid had no future profitability or viability and therefore the stock could

---

[33] *See, e.g.,* Compl. ¶¶ 52, 54 (Fundsolve purchased for $1.69 million despite revenues of only GBP 60,359 and cash of GBP 1,368); ¶¶ 59, 61, 64 (Liquid Partners purchased for $10.3 million loss); ¶¶ 71-72 (Green Mountain purchased for $19.9 million despite an accumulated deficit of $3.6 million and cash of $84,717); ¶¶ 77-78 (LTI purchased for over $5 million despite only $1.1 million in total net assets); ¶¶ 55, 66, 110 (Liquid View and Blackbird being acquired and the software facing functionality issues); and ¶¶ 32, 34-35, 42, 47 (The Founders received approximately $123 million in Liquid stock in exchange for Liquid Futures, Liquid Prime Holdings, Liquid Prime Services and Liquid Trading Institution, allegedly asset-less companies).

[34] *See e.g. Miller v. Welke* (*In re United Tax Grp., LLC*), 2016 WL 7235622, at *4 (Bankr. D. Del. Dec. 13, 2016); *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520-21 (D. Del. 2012).

not represent value. *See Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 WL 2212776 (S.D.N.Y. Aug 3, 2006) (explaining that absent some explanation, a plaintiff cannot argue out one side of its mouth that the debtor was in dire financial status, completely insolvent and doomed to fail financially, and argue out the other side that the transferred stock had tremendous value that should now be recoverable).  The *Global Crossing* court concluded that the stocks were of no value because the plaintiff repeatedly and emphatically asserted that the debtor was doomed to fail at the time of the allegedly fraudulent transfers. *Id.*  Here, the Court finds that the Trustee does not allege a dire financial status equivalent to that in *Global Crossing*. Despite alleging that Defendants perpetuated a fraudulent company to line their own pockets, the Complaint does not assert that Liquid "had passed the point of no return."[35] *Pitt Penn I*, 2010 WL 4352373, at *6.  For these reasons, the Court denies the Motions to dismiss Count Six.

**VI.    Count Seven – Avoidance of Transfers Under 6 Del. C. § 1304(a)(2), 1305(a) and 11 U.S.C. § 544**

Pursuant to Section 1304, a plaintiff may bring a fraudulent transfer claim if he pleads the transfer was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor… [i]ntended to incur, or believed

---

[35] Ferdinand specifically points to paragraph two of the Complaint to demonstrate the Trustee's allegations that Liquid "acquire[d] money-losing companies," "record[ed] millions in fictitious revenues and customers" and Defendants "perpetuate[d] the illusion that Liquid was a financially viable and emerging technology company…." Compl. ¶ 2.  These allegations are in the introductory section and are general in nature.  In the *Global Crossing* case, the Court referenced nineteen separate paragraphs that explained in detail the defendant's financial ruin. *Global Crossing*, 2006 WL 2212776, at *9 n. 13; *see also Pitt Penn I*, 2011 WL 4352373, at * 6 (finding that the *Pitt Penn I* case was not analogous to *Global Crossing* "because there are no allegations about the debtor's assets, debts, and equity, and because at this stage, there is no reason for the Court to conclude that [the plaintiff] had no potential for future profitability.").

or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 6 Del. C. § 1304(b). This statute mirrors closely Section 1305 which permits a fraudulent transfer claim to be pled if the plaintiff shows "the transfer was made or the obligation was incurred…without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation." 6 Del. C. 1305(a). Essential to both Section 1304(a)(2) and Section 1305(b) is the allegation of insolvency at the time of the transfer (or the rendering of insolvency due to the transfer). *See USDigital*, 443 B.R. at 38 n.35 (noting that to establish a constructively fraudulent transfer under Sections 1304(a)(2) and 1305(a) the plaintiff must show either insolvency at the time of the transfer or that the debtor became insolvent as a result of the transfer).

The Trustee pleads that the Transfers are avoidable under Sections 1304(a)(2) and 1305(a). The Trustee fails to assert claims under these provisions based on his inability to plead Liquid's insolvency at the time of the Transfers.

Delaware law considers insolvency to exist "if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."[36] 6 Del. C. § 1302(a). When pleading insolvency, generally a plaintiff only has to allege sufficient facts, not prove them. *See Joseph v. Frank (In re Troll Commc'ns., LLC)*, 385 B.R. 110, 124 (Bankr. D. Del. 2008)

---

[36] This definition mirrors the Bankruptcy Code, which finds an entity to be insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation…." 11 U.S.C. § 101(32)(A).

(citing *Foss Mfg. Co., Inc. v. Foss (In re Felt Mfg. Co., Inc.)*, 371 B.R. 589, 637 (Bankr. D.N.H. 2007)).  But, "there must be some sort of financial data or analysis provided so that the court can infer the company's liabilities exceeded its assets at the time the transfers in question took place." *O'Toole v. Karnani (In re Trinsium Grp.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

The Complaint does not include any financial data surrounding the Transfers that the Court can use to infer Liquid's insolvency.  The Transfers (which took place through the Acquisition Spree) occurred from April 2012 to September 2012.  Aside from explaining the value given and received for the Transfers, the Trustee posits no other financial information indicating that Liquid could not meet any financial obligations.  The Complaint suggests that that the first indication of Liquid suffering any financial difficulties was in February 2014, when the Company made its first call on QuantX receivables.  As pointed out by Defendants, the only financial data provided up to February 2014 is that Liquid received $1 million in licensing revenue (of which QuantX accounted for roughly 82 percent) and the IPO raised about $14.6 million in usable funds.  *See* Compl. ¶¶ 105, 111, 116.

The Trustee argues that a fair reading of the Complaint reveals a wealth of facts supporting insolvency, specifically citing to Storms' comment on being uncomfortable with the crazy valuation of the IPO and Liquid's reliance upon infusions from Von Allmen.  In support of his argument, the Trustee cites to *Halperin v. Moreno* (*In re Green Field Energy Services, Inc.*), 2015 WL 5146161, at *7 (Bankr. D. Del. Aug. 31, 2015), for the proposition that a detailed insolvency valuation is not required at the pleading stage.

42

*G*reen Field, however, cuts against the Trustee's case.  In *Green Field*, the trustee did not provide a detailed valuation, but did present "extensive information about the Debtors' financial condition *at or around the time*" of the transfer in question, including operating losses of $50-100 million, a 640% increase in new debt and a net working capital deficiency of approximately $333.4 million. *Id.* (emphasis added).  Such information surrounding Liquid's financial condition at our around the time of the Transfers cannot be gleaned from a reading of the Complaint.  For these reasons, the Court grants the Motions to dismiss Count Seven.

## VII.    Count Eight – Recovery of Avoidable Transfers under 11 U.S.C. § 550

The Trustee seeks to recover the Transfers avoided under Counts Six and Seven, pursuant to Section 550 of the Bankruptcy Code.  To begin, the Court notes that Count Eight in the Complaint alleges claims against all Defendants.  In his brief, the Trustee clarifies that this was a drafting error, and that Count Eight is limited to the same parties as Counts Six and Seven (the Founders and their entities). Tr. Br. Pg. 44, n. 26.  As the Trustee's comment was a clarification, and not an amendment to the Complaint, the Court dismisses Count Eight as it relates to all parties not mentioned in Counts Six and Seven.

Turning to the remaining parties, the disposition of Count Eight is determined by the Court's rulings on Counts Six and Seven. *See Ritz Camera & Image, L.L.C. v. Canon U.S.A., Inc.* (*In re Ritz Camera & Image, L.L.C.*) 2014 WL 432192, at *3 (Bankr. D. Del. Feb. 4, 2014) ("Where a party's only basis for dismissing the complaint for recovery of payments under 11 U.S.C. § 550 is the dismissal of the underlying claim, it is proper to

rule on the Section 550 claim in the same manner as the underlying claim."). Because the arguments are based upon dismissal of the underlying fraudulent transfer claims, the Motions to Count Eight will be granted in part and denied in part consistent with the treatment afforded to Count Six and Count Seven above.[37]

## VIII.   Count Nine - Corporate Waste

"The judicial standard for determination of corporate waste…entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). "If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile" no corporate waste exists. *Id.* "A claim of waste will arise only in the rare, 'unconscionable case where directors irrationally squander or give away corporate assets.'" *Disney*, 906 A.2d at 74 (quoting *Brehm*, 746 A.2d at 263). "The test for waste is extreme and rarely satisfied." *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015).

The Trustee alleges that the Acquisition Spree had no rational business purpose and was so commercially unreasonable that no business person of ordinary sound judgment could believe Liquid received adequate compensation for the Transfers. The Court does not find facts to support the Trustee's waste claim.

---

[37] Keller argues that the Trustee did not allege he or CMK to be the transferee or beneficiary of any of the Transfers. The Complaint clearly states with well-pled facts that Keller and CMK were involved in the Transfers, and accepting these facts as true, the Complaint contains enough factual information to satisfy the Trustee's burden. *See* Compl. ¶¶42-47, 67, 70.

The Trustee supports his arguments by pointing to cases in which a waste claim survived the motion to dismiss stage. *See Direct Media*, 466 B.R. at 657; *Official Comm. of Unsecured Creditors v. Kemeny* (*In re TEU Holdings*), 287 B.R. 26, 35 (Bankr. D. Del. 2002). The complaint and allegations in *Direct Media* stated that the corporation received "*no benefit, compensation or reimbursement*" in return for payments made. *Direct Media*, 466 B.R. at 657 (emphasis added). The *TEU* court permitted the waste claim to proceed based on the plaintiff's allegation that the software the defendants acquired "*was a complete failure and resulted in injury*" which rendered the defendants insolvent. *TEU*, 287 B.R. at 35 (emphasis added). The Complaint as posited by the Trustee, however, details at least some benefit Liquid received for each transfer during the Acquisition Spree;[38] and for any transfer which included software as a benefit, the Trustee makes no allegations that the performance of the software led directly to Liquid's insolvency. Under the high hurdle for corporate waste claims, the Trustee's allegations fail. For these reasons, the court grants the Motions to dismiss Count Nine.

---

[38] *See* Compl. ¶¶ 34-41 (Liquid acquired Liquid Prime Services, Inc. to act as a FINRA-registered broker-dealer); ¶¶42-48 (Liquid received interests in each of the "Founding Transfers"); ¶¶49-54 (Liquid received software rights from Fundsolve); ¶¶ 55-57 (Liquid received an algorithmic trading software from Tragara Alpha Partners LLC); ¶¶ 58-65 (Liquid acquired Liquid Partners LLC to establish a customer base and select group of traders and fund managers; ¶¶ 66-68 (Liquid received software rights from Liquid View); ¶¶ 69-74 (Liquid received software development from Green Mount Analytics LLC); ¶¶ 75-81 (Liquid acquired LTI with the purpose of using that entity to carry out an IPO through QuantX instead of Liquid).

**Conclusion**

For the foregoing reasons, the Court finds with respect to the Motions as follows:

Count One

Ferdinand:          DENIED as to Ferdinand's involvement with the Pre-IPO Deal and the QuantX inflated revenues.

GRANTED as to the remainder of the allegations.

Storms and Shifrin:  DENIED as to the QuantX inflated revenues.

GRANTED as to the remainder of the allegations.

Count Two

Ferdinand:          DENIED as to any duty of loyalty claims arising from the Pre-IPO Deal and the QuantX inflated revenues.

GRANTED as to the remainder of the duty of loyalty allegations and all duty of care claims.

Storms and Shifrin:  DENIED as to any duty of loyalty claims arising from the QuantX inflated revenues.

GRANTED as to the remainder of the duty of loyalty allegations and all duty of care claims.

Count Three         GRANTED

Count Four          GRANTED

Count Five          GRANTED

Count Six           DENIED

Count Seven         GRANTED

Count Eight         DENIED as to claims alleged in Count Six.

GRANTED as to claims alleged in Count Seven.

Count Nine          GRANTED

The Court will issue an order giving effect to its ruling.

Dated:   June 6, 2018

_____
KEVIN GROSS, U.S.B.J.